[No. 14124-8-II.    Division Two.    March 10, 1993.]

THE STATE OF WASHINGTON, *Appellant,* v. VICKI
LUND, *Respondent.*

438

*John W. Ladenburg, Prosecuting Attorney,* and *Chris Quinn-Brintnall, Senior Appellate Deputy,* for appellant.

*David W. Murdach,* for respondent.

MORGAN, J. — The State appeals from an order suppressing marijuana found in Vicki Lund's purse and suppressing her subsequent confession. We reverse.

The facts are essentially undisputed.[1] In the fall of 1989, Jonathon Woods, Wayne Anderson and Jeff Lane were charged with aggravated murder. All three men were in the Pierce County Jail pending trial, and all three had separate counsel.

On October 2, 1989, Deputy Berg of the Pierce County Sheriff's office was contacted by a defense attorney representing yet a fourth inmate of the Pierce County Jail. The attorney told Berg that his client had information about drugs being smuggled into the jail.

On October 6, Berg interviewed the inmate face to face in the jail. He asserted that drugs were being smuggled into the jail but provided no names. The State and the inmate then entered into a contract providing that in exchange for the inmate's cooperation, the State would grant him certain benefits in his own case.

On October 10, 1989, the inmate was again interviewed by Berg. He related that Wayne Anderson was possessing drugs inside the jail, and that Anderson was getting the drugs from his attorney, who was also his girlfriend. He said that he had received this information from Anderson himself and from other inmates. He said that he had seen the attor-

---

[1] In the trial court, the only witnesses were three police officers.

ney/girlfriend visit Anderson every few days; that he had seen them enter and exit the jail visiting room together; and that he had seen Anderson with controlled substances. He had not seen any actual drug deliveries. He did not know the attorney/girlfriend's name, but he described her as about 45 years old, 5 feet 3 inches, 105 to 110 pounds, blondish hair, and glasses.

Also on October 10, Berg and Sergeant Reed conferred with several prosecutors, including deputy prosecutor Jerry Horne. Horne thought the informant's description of the attorney/girlfriend fit a woman named "Vicki". He did not know Vicki's last name, but he knew she was a paralegal working for the attorney who represented Woods. According to Berg's later testimony, Horne said he had been concerned about a seemingly "infatuous" attitude between Vicki and Anderson.

Still on October 10, Berg returned to the jail and examined the visitors log. No one named "Vicki" had signed in to visit Anderson, but Vicki Lund, a paralegal employed by the law firm representing Woods, had signed in numerous times to visit Woods, another inmate named Dennis Weinrich, and "Programs and Services". No other "Vicki" was listed in the visitors log, and a check with the Department of Licensing confirmed that the informant's description of Anderson's attorney/girlfriend matched that of Lund.

Still on October 10, Berg again interviewed the informant. She was told by the informant that Vicki would be visiting Anderson later in the day.

On October 11, Berg again checked the jail log to see if Lund had visited Anderson the previous evening. She found that Lund had signed in to visit Woods.

On October 12, jailer Morales forwarded a report to Berg stating that at 7:40 p.m. on October 10, 1989, he had observed Lund and Anderson having contact with each other in one of the jail interview rooms. As already noted, Berg previously had learned that on the evening of October 10, Lund had signed in to see Woods, not Anderson.

On October 13, Officer Benton reported that a fifth inmate had complained about Anderson having drugs in the jail. According to the report, Anderson was getting drugs from his attorney.

On October 16, Deputy Hoffman received an anonymous phone call from someone outside the jail informing him that there was a good possibility drugs would be smuggled into the jail that night. The caller asserted where and when the transaction would occur. Hoffman forwarded this information to Berg.

On October 17, the original inmate informant told Berg that "Vicki" would be bringing drugs to Anderson that night. Berg obtained a court order authorizing her to videotape Lund and Anderson. The equipment was set up but removed after Lund failed to show.

Also on October 17, Hoffman received a second call from his outside informant, who was still anonymous. This informant stated that the deal had not taken place on October 16 as predicted, and agreed to meet Hoffman later that day. At the meeting, Hoffman obtained the informant's name and certain biographical information. The informant had no track record of reliability with the Pierce County Sheriff's Department, but Hoffman confirmed he had previously provided the Centralia Police Department with information leading to several arrests. The informant provided some details about the smuggling of drugs into the jail, and said he did not know when the next delivery would occur.

On October 18, at about 8:35 a.m., Hoffman's outside informant called him again. The informant told Hoffman that "Vicki" would soon meet a woman named Tanya in the Fred Meyer parking lot at 72nd and Pacific, pick up some drugs, then bring the drugs into the jail at about 10 a.m. He said "Vicki" would be driving a silver Toyota Celica, license number 550 ASK, and Tanya would be driving a gray Dodge pickup or a brown station wagon. Upon checking with the Department of Licensing, Hoffman found that 550 ASK was the license number of a silver Celica registered to Vicki Lund.

Four deputies staked out the Fred Meyer parking lot, and the silver Celica and brown wagon arrived as predicted. Each was occupied by a woman driver who had no passengers. The driver of the station wagon got into the Celica, and the two women conversed. After the driver of the brown station wagon exited the Celica, Lund drove north toward the jail, with deputies following.

Lund parked near the jail and went inside, with Deputies Hoffman and Reed still following. Lund and Reed rode the elevator to the visitors reception area on the fourth floor, where Lund signed in to see Dennis Weinrich. Control room personnel admitted her into a long corridor that leads from the reception area to the main part of the jail. The corridor has locked doors at each end. After Lund was out of earshot, Hoffman told the jail staff not to admit Lund to the main part of the jail.

While Lund was in the corridor, Deputies Hoffman and Reed approached her and identified themselves. One of them stated, "[W]e are investigating some contraband being smuggled into the jail, and we would like to talk to you." Lund replied, "I guess you guys have been waiting for me." One of the deputies said, "Yes, we were." One of them then went on to say, "We would like to go back to the reception area and talk to you there." At that point, Hoffman seized Lund's purse and briefcase,[2] saying "I'll take these."

When the three arrived back in the visitors reception area,[3] they went over to one corner and sat down. Lund was read her *Miranda* rights, which she said she understood. The officers asked her if she had any drugs on her person or in her purse, and she said she did. When the officers asked

---

[2]The deputies did not search Lund's briefcase. Instead, they sealed it with evidence tape without having opened it. They adopted this course of action because they were concerned that the briefcase might contain privileged documents having to do with the murder case.

[3]Testimony estimating the distance back to the reception area varied from 70 to 200 feet.

her for the drugs, she opened her purse (which apparently was still in Hoffman's possession), removed two baggies of marijuana, and handed them to Hoffman. Roughly 4 minutes elapsed from the initial stop in the corridor to when the marijuana was produced.

After Lund produced the drugs, the officers informed her she was under arrest, handcuffed her, and took her to a nearby interrogation room. There, they again advised her of her rights and, after signing a written waiver form, she gave a taped confession.

The State charged Lund with (1) unlawful possession of marijuana with intent to deliver and (2) unlawful possession of marijuana. The trial court granted Lund's motion to suppress the marijuana, and the State appeals.

The trial court did not find that Lund's act of producing the marijuana from her purse was a search by the police.[4] Essentially, its ruling was that Lund's act of producing the marijuana would not have occurred but for precedent, illegal police activity, and that the marijuana was therefore the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986). The issue, then, is whether the police acted illegally before Lund produced the marijuana from her purse. If not, the discovery of the marijuana was lawful, and the motion to suppress should have been denied. If so, the discovery of the marijuana was unlawful, and the motion to suppress was properly granted.

In order to determine whether the police acted illegally before Lund produced the marijuana from her purse, it is necessary to address two questions. First, did the police act illegally when they seized and detained Lund's person? Second, did the police act illegally when they seized and detained Lund's purse?

---

[4]Even if we assume her act was a search by the police, it was consensual and therefore lawful unless there was precedent, illegal police activity.

## I

Not every encounter between a citizen and the police constitutes the seizure of a person. *State v. Mennegar*, 114 Wn.2d 304, 310, 787 P.2d 1347 (1990). Thus, police do not necessarily effect the seizure of a person because they engage the person in conversation, *State v. Mennegar*, 114 Wn.2d at 310; *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983); *United States v. Mendenhall*, 446 U.S. 544, 554-55, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), or because they identify themselves as officers. *Florida v. Royer*, 460 U.S. at 498. However, police do effect the seizure of a person when they objectively manifest that they are restraining the person's movement, and "a reasonable person would have believed that he [or she] was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988) (quoting *United States v. Mendenhall, supra* at 554); *State v. Bennett*, 62 Wn. App. 702, 707, 814 P.2d 1171 (1991) (quoting *State v. Stroud*, 30 Wn. App. 392, 395, 634 P.2d 316 (1981), *review denied*, 96 Wn.2d 1025 (1982)), *review denied*, 118 Wn.2d 1017 (1992); *see also State v. Mennegar*, 53 Wn. App. 257, 260, 766 P.2d 491 (1989), *rev'd on other grounds*, 114 Wn.2d 304, 311, 787 P.2d 1347 (1990); *Mendenhall*, 446 U.S. at 554. When this test is met, the seizure may be an arrest to detain for later charging and trial (a "custodial arrest", *see, e.g., United States v. Robinson*, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973)), an arrest for purposes of brief further investigation (a *"Terry* stop", *see, e.g., Terry v. Ohio*, 392 U.S. 1, 16-20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)), or sometimes an arrest for some other purpose.[5] If a seizure is a custodial arrest, it must be supported by probable cause to believe that a crime has been committed by the arrestee, and probable cause exists "where 'the facts and circumstances within [the arrest-

---

[5]For example, to give a traffic citation, *State v. Hehman*, 90 Wn.2d 45, 578 P.2d 527 (1978), or to insure the orderly execution of a search warrant. *See Michigan v. Summers*, 452 U.S. 692, 696, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981).

ing officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution [to believe] that' [a crime] has been . . . committed." *Brinegar v. United States*, 338 U.S. 160, 175-76, 93 L. Ed. 2d 1879, 69 S. Ct. 1302 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925)); *State v. Fricks*, 91 Wn.2d 391, 588 P.2d 1328 (1979). If a seizure is a *Terry* stop, it need not be supported by probable cause to believe that a crime has been committed, *Florida v. Royer*, 460 U.S. at 498 (plurality opinion by White, J.); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *Kennedy*, 107 Wn.2d at 6, but it must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. at 21; *Kennedy*, 107 Wn.2d at 5 (quoting *Terry v. Ohio*, *supra*).

The trial court held that the police lacked probable cause to make a custodial arrest when they seized Lund's person in the jail corridor. We agree, because the police did not have probable cause to detain Lund for trial until the point at which she produced the marijuana from her purse. The question, then, is whether the police made a valid *Terry* stop of her person.

To decide whether the police made a valid *Terry* stop, it is necessary to address four questions set forth in *State v. Belieu*, 112 Wn.2d 587, 593-94, 773 P.2d 46 (1989): (A) Was there a forcible stop as opposed to a consensual encounter? (B) At the time of the stop, did the seizing officers have a reasonable suspicion of criminal activity? (C) During the stop, did the officers stay within the permissible limits of a *Terry* stop? And (D) Did the officers act reasonably in light of the overall circumstances of the particular case? To answer the first question affirmatively is to say that the Fourth Amendment applies; to answer the other questions affirmatively is to say that the Fourth Amendment is satisfied.

## A

The trial court held that the police seized Lund's person in the jail corridor, and we agree. It is unnecessary to determine whether the seizure occurred when the police told the jailers not to let Lund leave the corridor, when the police approached Lund and displayed their badges, or when the police told Lund to come with them to the reception area.

## B

When the police stopped Lund in the jail corridor, they possessed specific and articulable facts justifying a brief *Terry* stop for investigative purposes. At that time, they had information from Berg's inmate informant, from Hoffman's outside informant, and from their own corroborative investigation. Cumulated, that information was such that a reasonable person would have had a well-founded suspicion that criminal activity was taking place. *State v. Gluck*, 83 Wn.2d 424, 426, 518 P.2d 703 (1974).

## C

After the police stopped Lund, they did not exceed the permissible limits of a *Terry* stop. We discuss the duration and place of the stop.

A *Terry* stop must be limited in duration. *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983); *State v. Wheeler*, 108 Wn.2d 230, 235, 737 P.2d 1005 (1987). Ninety minutes is too long, *Place*, 462 U.S. at 709-10, but under certain circumstances 20 minutes is not. *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). The duration of the stop in this case was not too long, for only about 4 minutes elapsed from when the police stopped Lund in the corridor to when she produced the drugs from her purse.

A *Terry* stop must be limited as to place. *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); *Hayes v. Florida*, 470 U.S. 811, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985); *Wheeler*, 108 Wn.2d at 235. Thus, *Terry* does not allow police, based only on articulable suspicion, to seize a citizen and then transport him or her to the police station

for questioning or fingerprinting. *Dunaway v. New York, supra* (questioning); *Hayes v. Florida, supra* (fingerprinting). Nor does *Terry* allow police, based only on articulable suspicion, to take what begins "as a consensual inquiry in a public place" and escalate it "into an investigatory procedure in a police interrogation room". *Florida v. Royer,* 460 U.S. at 503.

▮ The fact that a *Terry* stop must be limited as to place does not mean that police can never move a detainee any distance for any purpose. Thus, "it seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest." 3 W. LaFave, *Search and Seizure* § 9.2(g), at 393-94 (2d ed. 1987). Such movement can be for reasons of safety and security, *Florida v. Royer,* 460 U.S. at 504 (dictum) ("there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention"); *United States v. Pino,* 855 F.2d 357 (6th Cir. 1988) (stop occurred on freeway off-ramp; proper to take suspect to area underneath overpass in order to get out of rain and promote safety of passing vehicles); *United States v. Richards,* 500 F.2d 1025 (9th Cir. 1974) (stop occurred on airport runway; proper to take suspect into terminal, where it was easier to talk and phone could be used); 3 W. LaFave § 9.2(g), at 393-94 (2d ed. 1987); *see People v. Stevens,* 183 Colo. 399, 517 P.2d 1336 (1973) (stop occurred in lobby area of prison; proper to take suspect to nearby conference room in order to facilitate questioning),[6] or even for convenience when otherwise reasonable under the circumstances. *See United States v. Pino, supra* (detainee moved under overpass to get out of rain); *United States v. Richards, supra* (detainee moved into terminal to get out of wind). *Terry*

---

[6]Lund properly points out that the federal courts later granted Stevens a writ of habeas corpus on grounds she had been custodially arrested. Nevertheless, we view the Colorado Supreme Court's opinion as providing at least some support for the proposition that police do not necessarily exceed the permissible scope of a *Terry* stop when they move a detainee a very short distance for purposes of safety or security.

also permits police to move a detainee so that a crime witness can make an identification, provided that the distance is short and the police have both "knowledge" that a crime has been committed and articulable suspicion that the detainee committed it. *State v. Wheeler* 108 Wn.2d at 236-37; *State v. Mitchell*, 204 Conn. 187, 199, 527 A.2d 1168, 1174 (1987).

In this case, Lund entered the jail of her own accord, and the police merely moved her from the corridor where they stopped her to a nearby visitors reception area. As an officer later testified, the only reason for the move was to "talk a little more conveniently than standing in the middle of the jail." Such a move was reasonable for purposes of safety, security and convenience, and it did not exceed the permissible scope of a *Terry* stop.

## D

Overall, the officers acted reasonably when they detained Lund's person. They were under a duty to prevent the introduction of more drugs into the jail, they had information that drugs were about to be brought in, and that information rose well above the minimum required for articulable suspicion. Given what they knew, it is difficult to see a less intrusive or more reasonable way of proceeding than to stop and detain Lund for approximately 4 minutes.

## II

Having concluded that the police were not unlawfully detaining Lund's person when she produced marijuana from her purse, we now turn to whether they were unlawfully detaining her purse at that time. We conclude they were not.

Lund correctly points out that the police did not briefly seize and retain her purse for purposes of further investigation. According to their express testimony, they seized it so they could search it, and they would have held it until they obtained a search warrant "[i]f she had not produced [the] marijuana voluntarily."[7]

We recently held that when police make *an otherwise valid*, warrantless seizure of a car, then desire to obtain a

---

[7] Brief of Respondent, at 11.

search warrant, they are not required to search the car immediately, whether or not they are permitted to do so. Instead, they may retain the car for the time reasonably needed to secure a warrant. *State v. Huff*, 64 Wn. App. 641, 653, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992).

■ For the reasons stated in *Huff*, we now extend its principle to a purse. When police make *an otherwise valid*, warrantless seizure of a purse, then desire to obtain a search warrant, they are entitled to retain the purse for the time reasonably needed to secure a warrant.

■ Two questions determine whether the police made an otherwise valid, warrantless seizure of Lund's purse. Did they have probable cause to believe that it contained contraband, and if so, did they have exigent circumstances justifying seizure of the purse without warrant? *See United States v. Ross*, 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982); *Arkansas v. Sanders*, 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979); *United States v. Chadwick*, 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977); *see also State v. Smith*, 88 Wn.2d 127, 135, 559 P.2d 970, *cert. denied*, 434 U.S. 876 (1977); *State v. Grinier*, 34 Wn. App. 164, 168-69, 659 P.2d 550 (1983); *State v. Huff, supra*.

■ When the police seized Lund's purse in the jail corridor, they had probable cause to search it.[8] Cumulatively if not separately, the information from Berg's informant,[9] the

---

[8]It is important to distinguish two types of probable cause. One is probable cause to custodially arrest Lund and detain her for trial. The other is probable cause to search her purse. As stated earlier, the police did not have probable cause to custodially arrest Lund, or detain her for trial, before she produced the marijuana from her purse. As explained in this paragraph, however, the police had probable cause to search her purse before they seized it.

[9]Under Const. art. 1, § 7, hearsay from an informant can establish probable cause, provided there is demonstrated reason to believe that the informant is veracious and has an adequate basis of knowledge. *State v. Huft*, 106 Wn.2d 206, 209-10, 720 P.2d 838 (1986); *State v. Jackson*, 102 Wn.2d 432, 688 P.2d 136 (1984). Under appropriate circumstances, veracity can be established by showing that the informant has a strong motive to be truthful. *State v. Bean*, 89 Wn.2d 467, 572 P.2d 1102 (1978) (offer of a favorable sentence recommendation gave informant a strong motive to provide accurate information); *State v. Estorga*, 60 Wn. App. 298, 803 P.2d 813 (offer to drop charges in exchange for accurate

information from Hoffman's informant,[10] the corroborative observations by various police in the jail and at Fred Meyer,[11] and the corroborative nature of Lund's statement, "I guess you guys have been waiting for me",[12] were such that a

---

information established strong motive to be truthful), *review denied*, 116 Wn.2d 1027 (1991); *State v. Smith*, 39 Wn. App. 642, 647, 694 P.2d 660 (1984) (offer of a reduction in charge from felony to misdemeanor gave informant a strong motive to be truthful), *review denied*, 103 Wn.2d 1034 (1985); *see State v. Hall*, 53 Wn. App. 296, 766 P.2d 512 (citing with approval *Smith* and *Bean*), *review denied*, 112 Wn.2d 1016 (1989). Under appropriate circumstances, an adequate basis of knowledge can be established not only by personal knowledge, but also by an admission against penal interest. *Spinelli v. United States*, 393 U.S. 410, 425, 21 L. Ed. 2d 637, 89 S. Ct. 584, 593 (1969) (White, J., concurring); *United States v. Carmichael*, 489 F.2d 983, 986 (7th Cir. 1973); *United States v. Wilson*, 479 F.2d 936, 941 (7th Cir. 1973); *United States v. Smith*, 462 F.2d 456 (8th Cir. 1972); *State v. Yaw*, 572 P.2d 856 (Hawaii 1977); compare *State v. Lair*, 95 Wn.2d 706, 710-11, 630 P.2d 427 (1981) (admission against penal interest used to establish veracity rather than basis of knowledge). The original inmate informant had a "strong motive to be truthful" because his goal was to receive favorable treatment, and to achieve that goal he had to give correct information. He had a basis of knowledge, because he had heard Anderson make statements against Anderson's penal interest — that Anderson was getting drugs into the jail through his "attorney" — and he had seen Anderson in possession of drugs shortly after Anderson met with his "attorney".

[10]The information from Hoffman's outside informant was not sufficient to establish probable cause by itself, because it failed to show the informant's basis of knowledge. Nonetheless, information from a reliable informant may be used to corroborate other cognizable information even when the informant's basis of knowledge is not shown, *State v. Lair*, 95 Wn.2d 706, 712, 630 P.2d 427 (1981), and the veracity of Hoffman's informant was established by the fact that in the past he had given information to the Centralia police department leading to several arrests. *State v. Wolken*, 103 Wn.2d 823, 827, 700 P.2d 319 (1985); *State v. Woodall*, 100 Wn.2d 74, 77, 666 P.2d 364 (1983). Thus, the police were entitled to use the information supplied by Hoffman's informant to corroborate other information that they accumulated. *State v. Woodall, supra*.

[11]These included at least the following: (1) Prosecutor Horne observed a seemingly "infatuous" attitude between Lund and Anderson; (2) jailer Morales saw Lund with Anderson in a jail interview room, in a situation indicating possible sexual contact, and Berg confirmed Lund had not signed in to see Anderson; (3) as predicted by Hoffman's informant, various officers saw Lund meet with another woman at Fred Meyer, then proceed to the jail.

[12]This statement can be used to justify the seizure of her purse because it came before the seizure of Lund's purse took place. It cannot be used to justify the seizure of Lund's person because, assuming her person was seized at or before the point at which the police first approached her and displayed their badges, it came after the seizure of her person took place.

reasonably prudent person would have believed that the purse contained contraband.

At the same moment, the police had exigent circumstances justifying seizure of the purse without a warrant. Only a short time before, they had received information Lund would be bringing drugs to the jail that morning, and they had spent the intervening time investigating and corroborating the information they had received. Their efforts continued right up to the time when they seized the purse in the jail corridor, and it seems apparent they had no time to get a warrant prior to that seizure.

Because the police had probable cause and exigent circumstances, they made a valid warrantless seizure of Lund's purse. After that seizure, their express intention was to obtain a search warrant, and they had the right to retain the purse for the time reasonably necessary to do that. They were well within that time when Lund produced the marijuana, and the purse was not being unlawfully retained when she elected to take that action.

In conclusion, the police were not illegally detaining Lund's person when she produced the marijuana from her purse. Nor were they illegally detaining her purse at that time. Lund's act of producing the marijuana was not tainted by illegal police activity, and her motion to suppress should have been denied.

Reversed and remanded for further proceedings.

ALEXANDER, C.J., and GREEN, J. Pro Tem., concur.

Review denied at 123 Wn.2d 1023 (1994).