[No. 14822-6-II.  Division Two.  January 28, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANCISCO FLORES-MORENO, *Appellant.*

---

734

*Thomas E. Doyle* and *Robert M. Quillian,* for appellant (appointed counsel for appeal).

*Patrick D. Sutherland, Prosecuting Attorney,* and *Jon Tunheim, Deputy,* for respondent.

MORGAN, C.J. — Flores-Moreno appeals from his conviction and exceptional sentence for possession of heroin. We affirm as modified.

On September 20, 1990, officers of the Tacoma Police Department asked the Pierce County Superior Court to issue a search warrant for drugs thought to be located in a residence at 645 Bavarian Lane, Lacey, Washington. In part, they based their request on information from a person named Lynda Neville. Their affidavit amply established Neville's reliability. It also established that Neville had described the occupant of the residence as a Mexican male, 5 feet 9 inches in height, named Arturo or Tico, and that Arturo or Tico had been delivering drugs at the residence on various occasions within the preceding 10 days.

After the court issued the warrant, the officers drove to Lacey to serve it. They were accompanied by members of the Thurston County Narcotics Task Force, including Lieutenant John Suessman. They were also accompanied by Keila, a trained, certified, drug-sniffing dog.

The officers arrived at the residence at about 5:45 p.m. Those approaching the front saw the defendant, Flores-Moreno, close the trunk of a Grand Prix automobile and approach the driver's door as if to get in. The automobile was parked in the driveway of the residence, and Flores-Moreno matched the general description of "Arturo or Tico". He was detained while the officers searched the house. Because he could not speak English, he could not communicate who he was or why he was there.

As some of the officers were dealing with Flores-Moreno, Suessman saw three people moving toward the back of the

house. He quickly intercepted them, with gun drawn. He later testified that one of the three "immediately threw his hands up in the air and shouted to me, 'I'm a police officer.' Once I inspected his credentials, he was, indeed, a Seattle police officer".[1]

After Suessman put his gun away, he learned that the three men were undercover officers who had begun a drug transaction with Flores-Moreno earlier that day. In Seattle, they had given him money with which he agreed to purchase cocaine and black tar heroin. They then had followed him to the residence at 645 Bavarian where, a moment before the Tacoma police arrived, they had watched him put what they believed were narcotics into the trunk of the Grand Prix.

Within a few minutes after Suessman accosted the Seattle officers, he and they returned to the front of the residence and asked that Keila's handler have her sniff the trunk of the car. Keila "indicated a positive reaction for the presence of narcotics in the trunk and on the door handle of the maroon Grand Prix."[2]

The officers then telephoned a judge of the Thurston County District Court and requested a search warrant for the Grand Prix. The warrant issued, and the ensuing search of the car revealed a "piece" of black tar heroin. According to findings made later by the trial court, this "piece" "was equivalent to 400 units or 'matchheads', each containing two to three personal dosages . . .".[3] It "was a sufficient quantity to support the average heroin addict for well over a year",[4] with a street value of approximately $10,000.[5]

On September 24, Flores-Moreno was charged with one count of unlawful possession of heroin with intent to distrib-

---

[1]Report of Proceedings (Jan. 3, 1991), at 22.

[2]Exhibit 1, at 3.

[3]Exceptional sentence finding of fact 3; Clerk's Papers, at 53.

[4]Exceptional sentence finding of fact 3; Clerk's Papers, at 53.

[5]Exceptional sentence finding of fact 2; Clerk's Papers, at 53.

ute. Before trial, he filed a motion to suppress, which the trial court denied.

Trial commenced on January 10, 1991, and Flores-Moreno testified. He claimed that after borrowing the Grand Prix from a friend in Seattle, he had driven to the residence in Lacey to find his brother. He denied both drug trafficking and drug possession.

At the end of the evidence, the trial court instructed the jury on both possession with intent to deliver and simple possession. The jury found the defendant not guilty of possession with intent to deliver, but guilty of possession.

On March 12, 1991, Flores-Moreno was sentenced. His standard range was 0 to 90 days, but the trial court imposed an exceptional sentence of 14 months. As part of the sentence, the court required Flores-Moreno to submit to a year of community placement. It also required that he "submit to . . . polygraph test at discretion of C.C.O."

On appeal, Flores-Moreno makes several contentions. First, he says the trial court erred in denying his motion to suppress. Second, he says the trial court erred in imposing an exceptional sentence. Third, he says the trial court erred in requiring him to submit to polygraph examinations.

I

Flores-Moreno says he was unlawfully detained because the police lacked articulable suspicion or other adequate reason to detain him, and because they detained him for a period longer than that permitted by law. His apparent premises are that the police lacked probable cause to arrest until they found the heroin, and that they found the heroin about an hour and a half to 2 hours after he was initially detained.[6] He also says the search warrant for the car was not supported by probable cause. For these reasons, he concludes that his motion to suppress should have been granted.

---

[6]Flores-Moreno testified that an hour and a half to 2 hours elapsed from when he was initially detained to when he was taken to jail. He did not testify concerning the amount of time that elapsed from when he was initially detained to when the heroin was found, and the trial court did not make a finding on that matter.

We address four questions. (A) Was the defendant lawfully detained at the outset? (B) Did the detention exceed the time permitted by law before the dog gave a positive reaction indicating drugs in the car? (C) Was the car lawfully detained from when the dog gave a positive reaction to when the police searched it? and (D) Was the car lawfully searched?

## A

■■ The defendant was lawfully detained at the outset.[7] Under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), an officer is entitled "to briefly detain, for limited questioning, a person whom he reasonably suspects of criminal activity . . .". *State v. Smith*, 102 Wn.2d 449, 452, 688 P.2d 146 (1984); *see also State v. Kennedy*, 107 Wn.2d 1, 5-6, 726 P.2d 445 (1986). Under *Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), a valid warrant to search for drugs "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted", even if the occupant is initially found outside the home.[8] *Summers*, 452 U.S. at 705; *see also State v. Broadnax*, 98 Wn.2d 289, 300, 654 P.2d 96 (1982) ("Thus, an occupant's constructive control over the premises which is the subject of a search warrant provides a sufficient connection with the suspected illegal activities to permit a detention of that individual.").

■ Here, *Terry* is satisfied because information provided by Neville gave the police an articulable suspicion of criminal activity on the part of a person who met the defendant's

---

[7] If when the police arrived they had reasonably suspected that the Grand Prix contained drugs, we would base this part of our analysis on whether the Grand Prix was lawfully detained pursuant to *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983) (property may be held for short, reasonable time on basis of reasonable suspicion). Before the police arrived, however, they knew nothing about the Grand Prix, and it seems clear that they did not acquire reasonable suspicion to believe it contained drugs simply because they saw Flores-Moreno closing the trunk. Therefore, it becomes necessary to analyze whether they lawfully detained Flores-Moreno's person.

[8] In *Summers*, the occupant of the home was contacted as he was descending the front stairs. 452 U.S. at 693.

description. *State v. Pimintel*, 55 Wn. App. 569, 572, 779 P.2d 268, *review denied*, 113 Wn.2d 1022 (1989). Additionally, *Summers* is satisfied because the police immediately had adequate reason to believe that Flores-Moreno was the occupant of the residence for which they had a warrant. Under either rule, the police had the right to detain Flores-Moreno initially.

## B

■ Under *Terry*, and we assume under *Summers*, detention must be brief, and not in excess of a reasonable time. *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985); *State v. Lund*, 70 Wn. App. 437, 446, 853 P.2d 1379 (1993). Here, only a few minutes elapsed from when Flores-Moreno was first detained until the dog reacted to drugs in the car. The trial court found that detention during that time was reasonable, and we agree.

## C

In *State v. Huff*, 64 Wn. App. 641, 653, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992), we held "that when an officer has probable cause to believe that a car contains contraband or evidence of a crime, he or she may seize and hold the car for the time reasonably needed to obtain a search warrant and conduct the subsequent search." Thus, the questions here are whether and when the police had probable cause to search the car, and whether they detained it for more than a reasonable time in order to secure a warrant.

■ The police had probable cause to search the car after the dog gave a positive reaction for drugs. When the Tacoma officers first drove up, they saw Flores-Moreno close the trunk of the Grand Prix and approach the driver's door as if to get in. Within a few minutes, the Seattle officers related that they had watched Flores-Moreno conduct a drug deal in Seattle; that they had followed him to Lacey; that the drug deal called for him to return to Seattle with drugs; and that they had seen Flores-Moreno put something in the trunk of the Grand Prix just before the Tacoma officers drove up.

Coupled with the Tacoma officers' observations and the drug dog's positive reaction to the car, these observations were such that a person of reasonable caution would have believed that the car contained drugs, and the police had probable cause to search as of that time.

Flores-Moreno claims that the dog's positive reaction cannot contribute to probable cause because the record inadequately demonstrates the dog's training and certification. Probable cause to search can be established by the positive reaction of a drug sniffing dog whose reliability has been shown. *State v. Wolohan,* 23 Wn. App. 813, 815, 598 P.2d 421 (1979), *review denied,* 93 Wn.2d 1008 (1980). Here, the telephonic affidavit supporting the search warrant stated that Keila had received 525 hours of training, had been certified by the Washington State Police Canine Association as a Certified Narcotics Detection Canine, and had participated in 97 searches in which narcotics were found. Exhibit 1, at 4. These qualifications show reliability for purposes of probable cause, and Flores-Moreno's claim is not well taken.

The police did not detain the car for more than a reasonable time. They detained it about 45 minutes after they acquired probable cause to search, and about 50 minutes overall. Both periods were reasonable under the circumstances.

## D

The car was lawfully searched. A search is lawful when conducted pursuant to warrant, and the warrant results from a showing of probable cause. *Zurcher v. Stanford Daily,* 436 U.S. 547, 549-50, 56 L. Ed. 2d 525, 98 S. Ct. 1970 (1978). Probable cause exists when a reasonable, prudent person would understand that a crime has been committed, and that evidence of the crime can be found at the place to be searched. *State v. Garcia,* 63 Wn. App. 868, 871, 824 P.2d 1220 (1992) (citing *State v. Fisher,* 96 Wn.2d 962, 965, 639 P.2d 743, *cert. denied,* 457 U.S. 1137 (1982)).

Here, the Grand Prix was searched pursuant to warrant, and the warrant was issued on probable cause. For the rea-

sons already discussed, the police had probable cause to search the car, and they adequately presented that cause to the issuing magistrate.

### E

We need not address whether the defendant's person, as opposed to the car, was lawfully detained from when the dog gave a positive reaction until the police found the heroin. During that period of time, no evidence was discovered on the defendant's person, and no statements were taken from him. Assuming without holding that the detention became unreasonably long at some point after the dog gave a positive reaction, there is no remedy that would affect this case.

### II

To reverse a sentence outside the sentence range, a reviewing court must find that the reasons supplied by the sentencing judge are not supported by the record that was before the judge; that those reasons do not justify a sentence outside the standard range for that offense; or that the sentence imposed was clearly excessive or clearly too lenient. RCW 9.94A-.210(4); *State v. Oxborrow*, 106 Wn.2d 525, 529, 723 P.2d 1123 (1986). Flores-Moreno concedes the trial court's findings are supported by the record.[9] He argues, however, that the trial court's findings do not justify a sentence outside the standard range, and that the sentence imposed was clearly excessive.

### A

The trial court found as follows:

1. On 20 September 1990, defendant was in possession of a quantity of black tar heroin which was substantially higher and in a greater amount than would be possessed by any one person.

2. The street value of the heroin [the] defendant possessed was approximately $10,000 and is part and parcel of the finding that the quantity of controlled substance is grossly in excess of what ordinarily would be possessed by one person.

3. That the quantity of heroin was equivalent to 400 units or "matchheads", each containing two to three personal dosages

---

[9]Brief of Appellant, at 19.

and was a sufficient quantity to support the average heroin addict for well over a year.

It also concluded as follows:

1. The fact that defendant was in possession of an extraordinary amount of a controlled substance justifies a sentence exceeding the standard range regardless of what defendant intended to do with it, and was a major [v]iolation of the Uniform Controlled Substances Act for Unlawful Possession of a Controlled Substance, RCW 69.50.401(d).

■ The State says the exceptional sentence is justified by RCW 9.94A.390(2)(d), *i.e.*, a major violation of the Uniform Controlled Substances Act. By its terms, however, RCW 9.94A.390(2)(d) only applies to major controlled substance violations "related to trafficking in controlled substances". Though undefined in the statute, "trafficking" does not mean simple possession. *See State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990) (undefined statutory term may be given its dictionary meaning). According to Black's Law Dictionary (6th ed. 1990), "trafficking" means the trading or dealing in certain goods. According to *Webster's Third New International Dictionary*, it means "to engage in commercial activity : buy and sell regularly". *See also* RCW 10.66.010(3). Thus, "trafficking" excludes simple possession, and simple possession is the crime here.

■ Although the trial court could not base an exceptional sentence on the aggravating factors in RCW 9.94A.390, those factors "are illustrative only and are not intended to be exclusive reasons for exceptional sentences." RCW 9.94A.390; *see also* RCW 9.94A.010; *State v. Perez*, 69 Wn. App. 133, 847 P.2d 532 (trial court has discretion to fashion individualized sentences when the facts of a particular case demand it), *review denied*, 122 Wn.2d 1015 (1993). When a sentencing court employs an aggravating factor outside RCW 9.94A.390 to justify imposition of an exceptional sentence, an appellate court must determine whether that aggravating factor is "substantial and compelling" as a matter of law. RCW 9.94A-.120(2); *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986).

■ To determine whether an aggravating factor is "substantial and compelling" as a matter of law, an appellate court asks two questions. *State v. Grewe*, 117 Wn.2d 211, 813 P.2d 1238 (1991). First, was the aggravating factor necessarily considered in setting the standard range for the offense? *Grewe*, at 215-16; *Nordby*, 106 Wn.2d at 518. Second, is the aggravating factor "sufficiently substantial and compelling to distinguish the crime in question from others in the same category"? *Grewe*, 117 Wn.2d at 216.

■ Both questions can be answered in favor of the State when the circumstances underlying a crime are distinctively "more onerous or egregious" than is typical for that crime. This concept has been applied in a number of contexts, including vehicular assault or vehicular homicide, *State v. Oksoktaruk*, 70 Wn. App. 768, 775, 856 P.2d 1099 (1993); *Perez*; *State v. Weaver*, 46 Wn. App. 35, 43, 729 P.2d 64 (1986), *review denied*, 107 Wn.2d 1031 (1987), and various degrees of assault. *State v. Warren*, 63 Wn. App. 477, 820 P.2d 65 (1991), *review denied*, 118 Wn.2d 1030 (1992);[10] *State v. Smith*, 58 Wn. App. 621, 624, 626-27, 794 P.2d 541 (1990) (the defendant's "random, senseless acts" of violence rendered his assault "more onerous than is typical" of that crime (Clerk's Papers, at 624)), *rev'd on other grounds sub nom. State v. Barnes*, 117 Wn.2d 701, 818 P.2d 1088 (1991); *see also State v. Holyoak*, 49 Wn. App. 691, 696, 745 P.2d 515 (1987) (defendant's conduct in committing assault was "significantly more serious or egregious than typical"), *review denied*, 110 Wn.2d 1007 (1988). There is no reason it cannot also be applied in the context of simple possession.

---

[10] In *Warren*, the defendant shot and seriously wounded his neighbor. Though he was charged with attempted second degree murder, the jury only convicted him of the lesser included offense of third degree assault. Nevertheless, the trial court imposed an exceptional sentenced based, in part, on the egregious nature of the injuries suffered by the neighbor.

The appellate court affirmed. It found that though the verdict reduced the level of the crime, it did not reduce the level of the injuries. Thus, the appellate court held that defendant's "conduct producing the harm, and the harm produced, were significantly more serious than what is typically involved in the crime." 63 Wn. App. at 479.

■ Here, Flores-Moreno possessed up to 1,200 doses of heroin, valued at $10,000. This is much more than is typically seen in simple possession cases. *See, e.g., State v. Valdobinos*, 122 Wn.2d 270, 287, 858 P.2d 199 (1993) (possession of one-half gram of cocaine is typical for standard possession). Thus, Flores-Moreno's crime is distinctively more onerous than is typical, and the trial court did not err by going outside the standard range. *See Grewe*, 117 Wn.2d at 215-16.

B

[14] In determining whether an exceptional sentence is clearly excessive, an appellate court reviews for abuse of discretion. *State v. Allert*, 117 Wn.2d 156, 815 P.2d 752 (1991); *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987). An abuse of discretion exists only when no reasonable person would have taken the position adopted by the trial court. *State v. Nelson*, 108 Wn.2d 491, 504-05, 740 P.2d 835 (1987).

Flores-Moreno's exceptional sentence was four times the high end of his standard range. However, exceptional sentences involving even higher multiples have been upheld. *Oxborrow* (15 times); *State v. Armstrong*, 106 Wn.2d 547, 723 P.2d 1111 (1986) (5 times); *State v. Creekmore,* 55 Wn. App. 852, 863-64, 783 P.2d 1068 (1989) (5 times low end, 3.75 times high end), *review denied*, 114 Wn.2d 1020 (1990). Given the amount of heroin possessed, we cannot say that no reasonable person would have taken the position adopted by the trial court, or that a 14-month sentence was clearly excessive.

III

Because Flores-Moreno had been convicted of a felony under RCW 69.50 and sentenced to total confinement with the Department of Corrections, the trial court was required to order a year of community placement as part of its sentence. RCW 9.94A.120(8)(a). As part of the community placement order, it was permitted to include crime-related prohibitions. RCW 9.94A.120(8)(c)(v).

█ Flores-Moreno contends that the condition of his sentence that required him to submit to polygraph examinations was not a crime related prohibition and thus not permissible. A "crime-related prohibition" is

an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct.

RCW 9.94A.030(11).

Arguably, a condition requiring a drug offender to submit to polygraph examinations satisfies the statute if it requires the offender to submit to polygraph examinations related to drugs. However, the condition in this case required Flores-Moreno to submit to polygraph examination on any and all subjects, at the discretion of his community corrections officer. Because it was so broad, it did not directly relate to his crime, and the trial court erred by imposing it.

The condition requiring polygraph examinations is stricken. In all other respects, the judgment is affirmed.

ALEXANDER and HOUGHTON, JJ., concur.

Review denied at 124 Wn.2d 1009 (1994).