[Nos. 27658-5-II; 27669-1-II. Division Two. February 7, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. DONNA ROTKO, ET AL., *Appellants*.

*Rita J. Griffith* and *Patricia A. Pethick*, for appellants.

*Gerald A. Horne, Prosecuting Attorney,* and *Kathleen Proctor* and *Sunni Young Ko, Deputies,* for respondent.

MORGAN, J. — Donna Rotko and David Marks appeal their convictions and exceptional sentences for first degree criminal mistreatment. We affirm.

Rotko and Marks have three children together. The oldest is Anthony, and the second is Joseph. Joseph, the victim here, was about 11 months old in January 2001. Helen Marks is David's mother.

On January 16, 2001, just after Rotko had delivered her and Marks' third child, Helen Marks took Joseph to St. Clare Hospital to see the new baby. When hospital staff members saw Joseph, they were "real concerned whether he was healthy or being taken care of . . . ."[1] He was very small,[2] his hair was "very patchy and falling out,"[3] his "eyes were deep [and] sunken,"[4] and he had "multiple lesions on his face . . . ."[5] A nurse asked that he be seen by a doctor that night, but Helen said she would take him to her doctor the next day.

On January 17, 2001, Helen took Joseph to Diana Vaughan, a family nurse practitioner. Vaughn found him to be very lethargic and weak, and unable to lift his head or arms. She called an ambulance, and he was rushed to Mary Bridge Hospital. He weighed "about 8-and-a-half pounds"[6] and was in "chronically critical condition."[7] Vaughn later

---

[1] Report of Proceedings (RP) at 168; *see also* RP at 291.

[2] RP at 294.

[3] RP at 295.

[4] RP at 295.

[5] RP at 291.

[6] RP at 312.

[7] RP at 311.

testified that "if Helen hadn't brought him in at that point, [he] might not have survived much longer."[8]

Shortly thereafter, a Child Protective Services caseworker asked Detective Teresa Berg to take Joseph into protective custody. She informed Berg that the hospital staff "were very concerned about his health" because "it appeared [he] had been starving."[9]

Berg spoke to Rotko at St. Clare. Berg "asked . . . was there anything wrong with him, and things like that."[10] "Rotko admitted knowing that Joseph was seriously ill, but she didn't take him to a doctor. She said that she was busy with Joseph's 2 year [old] brother and her pregnancy."[11]

Berg then went to Mary Bridge, where she spoke with Marks. The record does not show how Marks came to be at Mary Bridge.[12] It shows only that when Berg arrived there, she saw Marks standing outside the emergency room door. She told him that she "needed to talk to him [and] asked him to wait until [she] had a chance to check on Joseph . . . ."[13] A few minutes later, she, another officer, and Marks went to a "family quiet room,"[14] where she asked "about the care of the baby, the health of the baby, a lot of general questions about . . . how the baby was born and were there any problems, health problems, how the baby was being fed and . . . did they have any concerns about the baby, was the baby getting medical treatment . . . ."[15] Marks was "very cooperative, very talkative, very respon-

---

[8] RP at 162.

[9] RP at 12.

[10] RP at 12.

[11] Rotko Clerk's Papers (RCP) at 2.

[12] Marks' counsel asserted at oral argument that he had been "summoned" to Mary Bridge. The implication was that Marks had been summoned by police or other authorities. We can find nothing in the record to support the assertion or the implication.

[13] RP at 17.

[14] RP at 18.

[15] RP at 12-13.

sive to [the] questions."[16] When Berg began "to suspect that it was criminal mistreatment,"[17] she read Marks his *Miranda* (*Miranda v. Arizona*, 384 U.S. 43, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)) rights, and he signed a written waiver form. On the form, he indicated that he "voluntarily wish[ed] to answer questions now"[18] and was willing to speak with Berg.

On January 18, 2001, the State charged Rotko and Marks with first degree criminal mistreatment between June 1, 2000 and January 18, 2001. In June 2001, Rotko was examined by Dr. R.M. Hart, a psychologist at Western State Hospital. Dr. Hart thought that Rotko "has suffered since childhood with emotional difficulties,"[19] and that she had "a significant anxiety disorder from which she has developed [T]richotillomania[20] and obsessive-compulsive coping strategies."[21] He did not think, however, that these mental disorders "prevented her from knowing of the substantial risks to her son [or] . . . that these mental disorders caused her to disregard that risk."[22] Thus, he could not "support her proffered diminished capacity" defense.[23]

On June 13, 2001, the court held a CrR 3.5 hearing to determine the admissibility of Marks' statements to Berg. At the end of the hearing, the court ruled that the statements had been lawfully obtained, reasoning as follows:

> I believe the issue argued to this court really is what generally was going on at the time that Detective Berg was first asking questions of Mr. Marks.

---

[16] RP at 15.

[17] RP at 14.

[18] RP at 20.

[19] RCP at 19.

[20] This disorder "is primarily an expression of anxiety. It is a nervous habit, where individuals, because of their anxiety, pull their own hair." RP at 450. Rotko "appears to have pulled out approximately 90 percent of her head hair." RP at 450.

[21] RCP at 19.

[22] RCP at 22.

[23] RCP at 22.

. . . .

I believe that at that point she was doing an initial investigation, if the child has illnesses but is going through getting some kind of medical treatment. That's something she needed to know. If there was a doctor providing care, that's something she needed to know.

You have to get the basic facts before you know whether something criminal has occurred, and I believe she was in the investigatory process at the time she asked questions of Mr. Marks.

I believe with that being an investigation, that she was not required to give Miranda. In my view, it wasn't a custodial questioning, but it was investigation in a quiet family room down the hall in the hospital, and with that being the case, I don't believe that Miranda warnings were required.

With that being the case, there is no issue with regard to whether or not statements made after Miranda are or are not admissible unless there's an issue being raised now that there was some type of coercion or threats presented to Mr. Marks . . . .[24]

The trial court did not enter written findings until April 1, 2002.

A bench trial began on June 19, 2001. Karen Brown, a lead certifier for the Women, Infants, and Children Parkland program, testified that when Joseph was six weeks old, Rotko brought him in for an appointment. Thereafter, however, Rotko failed to show up for six scheduled appointments.

Helen Marks testified that she visited Rotko and Marks every Thursday. She would bring "food in the house every time."[25] Joseph's room was "very dark" because the window was covered with a dark blanket. She rarely saw Joseph outside his room, and she told Rotko and Marks she was concerned about Joseph's health.

---

[24] RP at 37-38. The court asked defense counsel if he intended to argue that "there was some type of coercion or threats presented to Mr. Marks . . . ." RP at 38. Defense counsel informed the court that he did not intend to pursue that issue. RP at 38.

[25] RP at 129.

Dr. Waterman, a family practice resident, described Joseph's condition when he was admitted to the hospital on January 17, 2001. He weighed 4.2 kilograms (approximately 9.24 pounds), which was "less than one percent of ideal body weight."[26] He "was emaciated, unable to lift his limbs, cachectic" and had "a weak cry . . . ."[27] He had "temporal wasting," the "back portion of his head was very flat,"[28] and his abdomen was "soft, fairly distended."[29] He had "sparse course [sic] hair, sunken eyes, very pale, conjunctiva, which is the white part of the eye."[30] He had "angular kyllosis bilaterally, which is skin breakdown at the corners of the mouth commonly seen in vitamin deficiencies."[31] His skin had also broken down "over the bony prominences particularly on the backs of his hips and the bony vertebrae in the midline of his back."[32] Overall, he suffered from "significant malnutrition" and "was at serious risk for death."[33]

Dr. Glenn Tripp, a pediatrician, described Joseph's development. At 12 months of age, Joseph was "immobile, could not sit, could barely maintain head control . . . couldn't move up against gravity . . . ."[34] His head circumference was 42.5 centimeters—substantially below the fifth percentile—even though his head had been of normal size at birth.[35] He had "some mild cerebral atrophy, meaning his

---

[26] RP at 62, 63.

[27] RP at 63, 64.

[28] RP at 65.

[29] RP at 65.

[30] RP at 64.

[31] RP at 64.

[32] RP at 65.

[33] RP at 75.

[34] RP at 194.

[35] Dr. Tripp testified that he plotted Joseph's head circumference on "a standard growth chart, which is substantially below the lowest line that's considered normal, which is the 5 percentile line." RP at 196-97.

brain is smaller than expected."[36] Both the head size and brain size indicated a prolonged lack of nutrition, for "[y]ou don't see loss of head circumference or cerebral atrophy until the amount of [mal]nutrition is quite severe and has lasted for quite some time."[37] Three months later, he was still "not at his age level, but [had] made remarkable gains,"[38] showing that "there is no problem with him growing. The problem was not being fed."[39]

Dr. Hart opined that Rotko "did not suffer from any mental disorder which deprived her from knowing the substantial risk to the victim . . . ."[40] He also thought that neither her methamphetamine abuse nor her anxiety disorder had prevented her from knowing the risks to Joseph. Dr. Washburn, a defense witness, opined that Rotko "lacked the capability of making a thorough assessment of not only the risk to the child, but the necessity of taking immediate action."[41]

The court found both Rotko and Marks guilty of first degree criminal mistreatment. Based on victim vulnerability, deliberate cruelty, and the protracted nature of the offense, it sentenced each of them to an exceptional sentence of 60 months. It entered its trial-related findings on July 6, 2001, and its exceptional sentence findings on August 28, 2001 (Rotko) and September 24, 2001 (Marks).

Rotko claims on appeal that the evidence is insufficient to support a finding that she recklessly caused "great bodily harm," and that the trial court erred by imposing an exceptional sentence. Marks claims on appeal that the trial court erred by admitting his statements to Berg, and also by imposing an exceptional sentence. We discuss (1) whether the evidence is sufficient to support a finding that

[36] RP at 199.

[37] RP at 201.

[38] RP at 195.

[39] RP at 201.

[40] RP at 432.

[41] RP at 368.

Rotko recklessly caused great bodily harm; (2) whether the trial court properly admitted Marks' statements to Berg; and (3) whether the trial court properly imposed exceptional sentences.

## I

 Rotko contends the evidence is insufficient to show that she recklessly caused great bodily harm to Joseph. RCW 9A.42.020(1) provides that "[a] parent of a child . . . is guilty of criminal mistreatment in the first degree if he or she recklessly, as defined in RCW 9A.08.010, causes great bodily harm to a child or dependent person by withholding any of the basic necessities of life." RCW 9A.08.010(1)(c) provides that "[a] person . . . acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation." "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."[42] Here then, the evidence is sufficient if a rational trier of fact viewing it in the light most favorable to the State could find (1) that Rotko caused great bodily harm to Joseph by withholding the basic necessities of life; and (2) that Rotko knew of and disregarded a substantial risk of such harm in such a way as to grossly deviate from conduct that a reasonable person would have exercised in the same situation.

Rotko does not contest the first proposition, nor could she successfully do so. The record amply supports findings that she withheld food and other necessities essential to Joseph's development.

 Rotko contests the second proposition, but the evidence is amply sufficient to support it. Rotko knew about

---

[42] *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)).

the nutritional needs of children, for her older child, Anthony, was thriving at age two. Being with Joseph every day, Rotko necessarily knew that he was not eating and had gained only three pounds in his first 11 months of life. Just by looking at him, she must have known that he needed medical care. A reasonable person certainly would have fed Joseph and obtained medical care for him, long before his condition became "chronically critical."[43] Dr. Hart testified that she "did not have diminished capacity to understand her child's needs in terms of nutrition, medical care and attention,"[44] and the trial court was entitled to credit his testimony. A rational trier of fact taking the evidence in the light most favorable to the State could easily have concluded that Rotko recklessly caused great bodily harm by withholding the necessities of life.

## II

Marks contends that his statements to Berg "should have been suppressed because Berg's initial interview constituted custodial interrogation without *Miranda* warnings, and the remaining interview was not independent of the initial illegal interview."[45] The State responds that the trial court "properly determined that the pre-*Miranda* statements of Marks were not the product of 'custodial interrogation.' "[46]

*Miranda* warnings are required before custodial interrogation.[47] A defendant is in custody if his or her freedom of movement is restricted to "the degree associated

---

[43] RP at 311.

[44] RCP at 42 (Finding of Fact 18).

[45] Br. of Appellant Marks at 15.

[46] Br. of Resp't at 11.

[47] *State v. Willis*, 64 Wn. App. 634, 636, 825 P.2d 357 (1992) (citing *State v. Sargent*, 111 Wn.2d 641, 647-48, 762 P.2d 1127 (1988)).

with a formal arrest."[48] Thus, not all police interviews are custodial. As the Supreme Court held in *Oregon v. Mathiason*,[49]

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.[50]

The record in this case does not show that Marks was in custody at the time of questioning. He was questioned in a "family quiet room" at the hospital. He was not handcuffed or physically restrained in any way. He was not told that he could not leave, even though Berg asked him to wait. According to Berg's testimony, which the trial court was entitled to credit, she was still trying to gather the information she needed to make a decision on whether to restrain him, and she had not yet decided whether to do that. The trial court was entitled to find that Marks was not in custody, and to conclude that *Miranda* did not yet apply.

## III

■ Both Rotko and Marks claim that the trial court lacked authority to impose exceptional sentences. A trial court "may impose a sentence outside the standard sentence range for an offense if it finds ... that there are

---

[48] *State v. Post*, 118 Wn.2d 596, 606, 826 P.2d 172, 837 P.2d 599 (1992) (citations omitted).

[49] 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977).

[50] 429 U.S. at 495.

substantial and compelling reasons justifying an exceptional sentence."[51] An appellate court may reverse only if it finds, using a clearly erroneous standard, "that the reasons supplied by the sentencing court are not supported by the record which was before the judge"; using a de novo standard, "that those reasons do not justify a sentence outside the standard sentence range for that offense"; or, using an abuse of discretion standard, "that the sentence imposed was clearly excessive . . . ."[52] In this case, the trial court based its exceptional sentences on victim vulnerability, deliberate cruelty, and the protracted nature of the offense, so we turn to each of those reasons.

## A. Victim vulnerability

Under RCW 9.94A.535(2)(b), a trial court may consider as one factor supporting an exceptional sentence whether the "defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health." The court here found that Joseph was particularly vulnerable because he was only a few months old. Rotko and Marks claim this was improper because Joseph's age was already included in the crime of criminal mistreatment.

■ Although a trial court may not base an exceptional sentence on factors that the legislature necessarily considered when setting the standard range for that *type* of offense,[53] a trial court may base an exceptional sentence on factors that distinguish the *particular* offense from others

---

[51] RCW 9.94A.535.

[52] RCW 9.94A.585(4). *See also State v. Solberg*, 122 Wn.2d 688, 705, 861 P.2d 460 (1993); *State v. Pryor*, 115 Wn.2d 445, 450, 799 P.2d 244 (1990); *State v. Flores-Moreno*, 72 Wn. App. 733, 742, 866 P.2d 648, *review denied*, 124 Wn.2d 1009 (1994).

[53] *State v. Barnes*, 117 Wn.2d 701, 706, 818 P.2d 1088 (1991); *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986).

of the same type.[54] Thus, a particular victim's *extreme youth* will support an exceptional sentence for statutory rape[55] or indecent liberties,[56] even though the entire class of victims must be less than a certain age.

When the legislature set the standard range for criminal mistreatment in the first degree, it considered a class of victims under the age of 18. It did not consider an infant in the first 11 months of life.[57] The trial court was permitted to use Joseph's extreme youth as an aggravating factor, and it did not err by finding he was particularly vulnerable.

## B. Deliberate cruelty

The trial court found that "the defendant's conduct of withholding food and/or not providing adequate nutrition and withholding medical care to baby Joseph while Anthony, Joseph's older brother, was adequately fed and cared for manifested deliberate cruelty to the victim . . . ."[58] While recognizing that deliberate cruelty is a statutory aggravating factor,[59] Rotko and Marks argue that the trial court's finding is not supported by the record.

Deliberate cruelty is " 'gratuitous violence, or other conduct which inflicts physical, psychological or emotional pain as an end in itself.' "[60] To support an exceptional

---

[54] *State v. Chadderton*, 119 Wn.2d 390, 395, 832 P.2d 481 (1992); *State v. Fisher*, 108 Wn.2d 419, 423-24, 739 P.2d 683 (1987).

[55] *State v. Stevens*, 58 Wn. App. 478, 794 P.2d 38 (statutory rape of three-year-old), *review denied*, 115 Wn.2d 1025 (1990).

[56] *Fisher*, 108 Wn.2d 419 (taking indecent liberties with five-year-old).

[57] *See State v. Bartlett*, 74 Wn. App. 580, 593, 875 P.2d 651 (1994) (victim vulnerability is not an element of criminal mistreatment), *aff'd*, 128 Wn.2d 323, 907 P.2d 1196 (1995).

[58] RCP at 68; Marks Clerk's Papers (MCP) at 33.

[59] RCW 9.94A.535(2)(a).

[60] *State v. Baird*, 83 Wn. App. 477, 487, 922 P.2d 157 (1996) (quoting *State v. Smith*, 82 Wn. App. 153, 163, 916 P.2d 960 (1996)), *review denied*, 131 Wn.2d 1012 (1997).

sentence, it must be conduct "not usually associated with the commission of the offense in question."[61]

■ The record in this case shows that Rotko and Marks withheld food from Joseph for most of his short life. They also left him alone in a dark room where he "was ignored, minimally fed, barely cared for, barely moved."[62] Their conduct was so egregious that Joseph developed cerebral atrophy and "was at serious risk for death."[63] At the very same time, they were providing ample food to Anthony and having him sleep with them every night. The results were that Anthony was thriving while Joseph was wasting away. These facts support reasonable inferences that Rotko and Marks knew the essentials that a child needed to survive, and that they deliberately and cruelly decided not to provide those to Joseph. The trial court was permitted though not required to draw those inferences, and it did not err by finding deliberate cruelty.[64]

## C. Protracted offense

The trial court found that the "defendants withheld adequate food, nutrition and necessary medical care over a lengthy or 'protracted' period of time."[65] Rotko and Marks do not contest the finding that the mistreatment lasted for most of Joseph's life. They do argue, however, that the duration of mistreatment is a factor necessarily included in the crime itself, and thus that it will not support an exceptional sentence. Based on former RCW 9.94A.390(2)(e)(v) (1999), now codified as RCW 9.94A.535(2)(e)(v), the State responds

[61] *State v. Crane*, 116 Wn.2d 315, 334, 804 P.2d 10 (citation omitted), *cert. denied*, 501 U.S. 1237 (1991); *see also State v. Valentine*, 108 Wn. App. 24, 30, 29 P.3d 42 (2001), *review denied*, 145 Wn.2d 1022 (2002).

[62] RP at 588.

[63] RP at 75.

[64] We reject Marks' argument that the trial court erred by relying on "intentional conduct which could have been charged, but was not . . . ." Br. of Appellant Marks at 26. This record shows a withholding of food and other essentials, but it does not show an assault. Thus, the State could not have charged an assault.

[65] RCP at 68; MCP at 33.

that the duration of the offense is a statutorily recognized factor. The State also argues that criminal mistreatment need not be of prolonged duration, so that duration is an element of the crime.

 We reject the State's first response. Former RCW 9.94A.390(2)(e)(v), now codified as RCW 9.94A.535(2)(e)(v), applies only if the "current offense was a major violation of the Uniform Controlled Substances Act . . . ."

 We agree with the State's second response. Criminal mistreatment can occur over a few days or, as here, over a much longer period of time. A duration of 11 months is so extended that a trial court may consider it as a factor tending to distinguish the particular crime from others of the same type. We do not decide whether such factor would be sufficient by itself, in light of the other factors present here. We conclude that the trial court did not err.

Arguments not addressed lack merit or need not be reached.

Affirmed.

QUINN-BRINTNALL, A.C.J., and HOUGHTON, J., concur.