860 P.2d 217

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Diane Castro GARCIA, Defendant–
Appellant.**

**No. 14034.**

Court of Appeals of New Mexico.

Aug. 26, 1993.

Tom Udall, Atty. Gen., Max Shepherd, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Amme M. Hogan, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

ALARID, Judge.

Appellant was charged with bringing contraband (marijuana) into a place of imprisonment in violation of NMSA 1978, Section 30–22–14 (Repl.Pamp.1984). Following an unsuccessful hearing on a motion to suppress, and subject to the right to appeal the decision concerning suppression of the evidence, Appellant pleaded guilty. Because we conclude that the detention and strip search of Appellant was conducted by prison authorities in violation of the fourth amendment right to be free from unreasonable searches, we reverse the trial court's decision concerning the suppression of evidence and remand.

### BACKGROUND AND FACTS

On November 8, 1991, an associate warden at the Southern New Mexico Correctional Facility (hereinafter "SNMCF") received an anonymous telephone call. The caller informed the associate warden that Diane Castro Garcia (hereinafter "Appellant") used her children to smuggle heroin into SNMCF. The caller reported Appellant residing at a local Las Cruces address and that the heroin was intended for Appellant's husband, who, at that time, was incarcerated at SNMCF. After receiving the anonymous phone call, the associate warden requested permission from his superior, deputy warden Ron Lytle, to conduct a strip search of Appellant the next time she attempted to enter SNMCF.

On November 9, 1991, after Appellant signed in at SNMCF to visit her husband, she was informed by prison personnel that the warden wanted to visit with her. Two female correctional officers and a captain with the New Mexico Department of Corrections then escorted Appellant to the warden's conference room. The reception guard retained her driver's license, which Appellant had produced for identification. The location of the conference room is within the interior area of the prison and is reachable only by passing through electronic security doors. After entering the conference room and taking seats at a conference table, the captain informed Appellant that she was suspected of bringing contraband into the prison. The captain then requested permission from Appellant to conduct a strip search. Appellant refused to consent to a strip search. The captain then informed Appellant that if she did not consent, the state police would be contacted "to see about" obtaining a search warrant. After further detention, Appellant surrendered two baggies of marijuana to the prison guards and was then strip searched.

### DISCUSSION

#### Standard of Review

■ This Court will not disturb a trial court's denial of a motion to suppress if it is supported by substantial evidence, unless it appears that the ruling of the court was erroneously premised upon the law or facts. *State v. Boeglin*, 100 N.M. 127, 666 P.2d 1274 (Ct.App.1983).

## Strip Searches of Visitors to Penal Institutions

Strip searches of visitors to penal institutions presents this Court with a question of first impression. "[A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982); *see also Burns v. Loranger*, 907 F.2d 233, 235 n. 6 (1st Cir.1990) ("[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual."); *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir.) (recognizing the "severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities"), *cert. denied*, 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). However, prison visitor search cases from other jurisdictions have considered the appropriate legal standard under which prison authorities may justify strip searches.

In the seminal federal appellate decision addressing this issue, the *Hunter* court explained: "After weighing the interest of correctional officials in preserving institutional security against the extensive intrusion on personal privacy resulting from a strip search, we conclude that the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions." *Hunter*, 672 F.2d at 674. As rationale, the *Hunter* court stated: "We believe that this standard is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers." *Id.* (citing *United States v. Asbury*, 586 F.2d 973 (2d Cir.1978); *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir.1978); *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977)).

 The great weight of authority follows *Hunter*, requiring reasonable suspicion before a prison visitor can be strip searched. *See, e.g., Cochrane v. Quattrocchi*, 949 F.2d 11 (1st Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Blackburn v. Snow*, 771 F.2d 556 (1st Cir.1985); *Thorne v. Jones*, 765 F.2d 1270 (5th Cir.1985); *Daugherty v. Campbell*, 935 F.2d 780 (6th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *see Commonwealth v. Gumby*, 398 Pa.Super. 155, 580 A.2d 1110 (1990); *Estes v. Rowland*, 14 Cal.App.4th 508, 17 Cal.Rptr.2d 901 (1993). *But see State v. Custodio*, 62 Haw. 1, 607 P.2d 1048 (1980); *Wells v. State*, 402 So.2d 402 (Fla.1981). In the above cases it appears that prison policy permitted a visitor to refuse to be searched, in which case the visitor was escorted off the premises. Although none of the opinions specifically held that even when reasonable suspicion is present the visitor must be afforded the opportunity to refuse to be searched and be escorted off the premises, we so hold in this case. *See Estes v. Rowland.* Ordinarily, probable cause is required to justify a search or seizure. If the demands of the prison environment are to justify a lesser standard—the reasonable suspicion standard—for strip searches of visitors, the lesser standard can be justified only to the extent necessary. If the objectives of the search—the prevention of the introduction of weapons or contraband into the prison environment—can be accomplished by less intrusive means, those means should be required of prison officials when they are a reasonable alternative to a search. In our view, the escorted departure of a visitor who refuses to submit to a strip search is such a reasonable alternative. As stated in 4 Wayne R. LaFave & David C. Baum, *Search and Seizure* Section 10.7(b), at 46 (2d ed. 1987):

A search without probable cause of a jail visitor is justified only by the need to prevent the introduction of contraband and weapons into the jail, and this is accomplished if the person declines to be searched and departs.... In short, special search procedures not based upon probable cause which are reasonable under the Fourth Amendment as means of *preventing* certain conduct should not be extended to situations in which only de-

tection rather than prevention is accomplished. (Footnotes omitted.)

### SNMCF's Prison Visitor Strip Search Policy

Buttressing our conclusion that escorted departures of visitors who refuse to submit to a strip search is a reasonable alternative that protects prison interests is the fact that this appears to be the written policy of SNMCF. In this respect, we first consider the written Statement of Understanding, which prison visitors sign as part of a process of receiving permission to visit inmates. In the statement, visitors are warned that it is a violation of state law to bring any article of contraband into a New Mexico correctional facility. The statement explains that upon entry to facility grounds, all visitors will be questioned by the Traffic Control Officer and vehicles may be searched. The statement then notes that "[i]ndividuals who choose not to enter at this point will be escorted off institutional grounds." Further, the statement advises that all persons entering the correctional facility will be required to pass through a metal detector and that all packages and items carried into the institution are subject to search.

Moreover, the Statement of Understanding, specifically informs visitors, although in somewhat confusing terminology, that "[w]here there exists a reasonable suspicion that a particular visitor is attempting to introduce contraband into the Institution, the Duty Officer at the facility may order at any time that the visitor be subjected to a more thorough search." However, the statement also notes that "[a] visitor may be requested to remove his/her clothing to submit to a strip search only when the Duty Officer determines that there is probable cause to believe that the particular visitor possesses contraband." And finally, the Statement of Understanding reveals that "[v]isitors who refuse to [submit to] a strip search when requested based upon reasonable suspicion will not be allowed to visit and may be held for local authorities who will provide transportation to county detention facilities for arrest pro-

cessing." Although the policy expressed in the Statement of Understanding is less than clear, we believe it does present evidence of SNMCF's intention of escorting visitors from the prison grounds if they choose not to be searched.

The controlling consideration, however, with regard to determining SNMCF's policy of strip searching prison visitors is language found in the facility's Inmate Visiting Log, which visitors sign prior to each visit. In the log, visitors are informed that "prior to entering the facility, upon reasonable cause, [visitors] may be subject to search." Although it is not clear what type of search is referred to, the log notes that "[i]f you choose not to enter, you will not be subject to a search and you will be escorted from the facility grounds." Moreover, the Inmate Visiting Log discloses that by signing the document, visitors acknowledge that they have read and consent *"with the above policy."* (Emphasis added.)

In sum, we hold that strip searches of prison visitors can be justified on the basis of reasonable suspicion, but only if such searches are conducted as part of a prison procedure that informs visitors before being searched that they have the right to refuse to be searched, in which case they will be escorted off the prison grounds. In other words, part of the consideration for the reasonable suspicion standard is the warning given the visitor and the opportunity to avoid the search by leaving the premises. It is clear from our research that such a policy, as we approve, is in accord with the strip search policies of other jurisdictions. *See Blackburn*, 771 F.2d at 567 (the prison officials argued that the visitor was free to leave the jail if she wished to forego the visit); *Thorne*, 765 F.2d at 1270–71 (after the visitor refused to be searched, she was escorted back to the front gates of the prison and departed); *Hunter*, 672 F.2d at 670 (the visitor was given the option of submitting to a strip search or foregoing the visit with her husband).

### Appellant's Detention and Strip Search

In the present case, immediately after Appellant signed in at SNMCF in order to visit her husband, she was told that the warden wanted to visit with her and was then escorted by prison personnel to the warden's conference room. Once in the conference room, she was told that she was suspected of carrying contraband and was requested to consent to a strip search. She refused. At that point, instead of advising Appellant that, by refusing to consent, she would be escorted off the premises and would be required to forego the opportunity to visit with her husband, the prison captain informed Appellant that if she refused the search, he would call the state police in order to obtain a search warrant. Appellant then surrendered the marijuana to the prison guards. However, when Appellant refused to consent to the search, prison authorities should have escorted her off the premises. They had no authority to conduct a search and the evidence from any subsequent search would need to be suppressed.

Nor can the evidence be admitted on the theory that Appellant voluntarily turned over the marijuana. In the absence of probable cause, the guards had no right to detain Appellant for the purpose of providing state police officers time to obtain a search warrant. Consequently, the guards had no right to inform her that she would be detained for that purpose. This threat of an unlawful detention tainted any consensual disclosure of evidence by Appellant in response to the threat. *See State v. Bedolla*, 111 N.M. 448, 453–56, 806 P.2d 588, 593–96 (Ct.App.), *cert. denied*, 111 N.M. 416, 806 P.2d 65 (1991). Further, we believe that the link between the unlawful threat and the consent is so direct that the State could not establish sufficient attenuation between the illegality and the consent, and that the unlawful threat " 'had a quality of purposefulness.' " *Id.* 111 N.M. at 456, 806 P.2d at 596 (quoting *Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)). Therefore, the district court should have granted Appellant's motion to suppress.

### CONCLUSION

Part of the rationale behind allowing prison officials an exception to the Fourth Amendment's warrant requirement is their interest in keeping contraband out of the prison environment. By adhering to the strip search policy as announced in the Inmate Visiting Log, whereby visitors who wish not to be strip searched are escorted from the facility, the goal of keeping contraband out of the prison environment is achieved. Further, by adhering to such a policy, prison visitors' fourth amendment rights to be free from unreasonable searches are maintained. Here, Appellant's rights were not protected. Therefore, we reverse the trial court's decision concerning the suppression of evidence and remand.

**IT IS SO ORDERED.**

BIVINS and HARTZ, JJ., concur.