[No. 19465-1-II. Division Two. December 19, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. ELIZABETH EVA DANE, *Appellant*.

Rob Roy Cossey and *James A. Richman*, for appellant.

*David H. Bruneau, Prosecuting Attorney*, and *C. Danny Clem, Deputy*, for respondent.

ARMSTRONG, J. — Elizabeth Dane was arrested for smuggling marijuana and heroin into Clallam Bay Corrections Center. She appeals a jury conviction for two counts of possession of a controlled substance with intent to deliver. She claims that the trial court erred in admitting the drugs and her confession because (1) the correctional investigators had no authority to detain and question her, and (2) even if the correctional investigators had such authority, they exceeded the scope of a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The State raises

various issues on cross-appeal. We reverse and remand, holding that the motion to suppress should have been granted because the correctional officers had no authority to detain and question Mrs. Dane beyond a request to search, which, if refused, could have been followed only by expulsion from the facility. In view of our holding on this issue, we do not address the State's appeal.

## FACTS

William Dane is an inmate at Clallam Bay Corrections Center. In August 1994, correctional investigators[1] Lori Hansson and James Reno received an anonymous note indicating that inmate Doug Zibell was pressuring Mr. Dane to have his wife, Elizabeth, smuggle drugs into the prison. Reno and Hansson knew that drugs were often smuggled into the prison hidden in body cavities. And they knew Mr. and Mrs. Dane had scheduled conjugal visits for September and October 1994. The investigators started watching Mr. Dane, and they noticed he was associating with four inmates who had previous drug problems with prison authorities.[2]

Mrs. Dane visited the prison on October 11, passing through a locked gate at the parking lot entrance and two gates in the prison facility. Signs at both the parking lot and inner gate warn that any person entering is subject to search.[3]

In addition to the two signs, Mrs. Dane signed the prison search policy and a consent to search which stated that

---

[1] The trial court found that the correctional investigators were not authorized to make arrests.

[2] The investigators later concluded that Zibell was not pressuring Mr. Dane.

[3] Parking lot sign:

Notice: Premises of Clallam Bay Correction Center: Any person and/or subject vehicle entering these premises is subject to search. It is prohibited to bring on the grounds any intoxicants, narcotics, dangerous drugs, firearms, explosives or dangerous weapon. Any person knowingly possessing a deadly weapon, narcotics, drugs or controlled substances upon these premises is guilty of a felony. Violators will be prosecuted.

"she was subject to search and consenting to search as a condition [of] being within the prison to visit her inmate husband, and that if she refused to be searched she would be immediately escorted from the prison."

After passing through the gates and signing the documents, Mrs. Dane went to a public area inside the prison. She testified that she needed to use the restroom because she drank a 44-ounce soft drink while driving to the prison. Investigator Hansson followed Mrs. Dane into the women's restroom. Mrs. Dane was inside an "enclosed stall."[4] Hansson introduced herself and said she needed a few minutes to speak with Mrs. Dane. Mrs. Dane did not use the toilet and agreed to follow Hansson into a private room used for attorneys and their clients.[5] To get to the room, a visitor must enter through two secured doors and have a pass or an escort.[6]

Investigator Reno was waiting inside the private room. He advised Mrs. Dane of her *Miranda* rights; she replied that she understood and agreed to talk. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966). Reno saw that Mrs. Dane was very nervous, and he told Mrs. Dane he suspected her of smuggling contraband into the prison. Mrs. Dane denied it at first but then said: "I'm not admitting anything, but what if I gave it up to you." After further discussion, Mrs. Dane asked Hansson and Reno for (1) protection for her husband and

---

Inner gate sign:

 Notice: Premises of Clallam Bay Correction Center: Any person or vehicle entering these premises is subject to search. It is prohibited to bring on to the grounds any intoxicants, narcotics, dangerous drugs, firearms, explosive or dangerous weapon. Any person knowingly possessing a deadly weapon, narcotic drug or controlled substance upon these premises is guilty of a felony. Violators will be prosecuted.

[4]Mrs. Dane testified that she was inside the stall and was about to take off her pants.

[5]Investigator Hansson estimated the distance from the public area to the private room as 200 to 300 feet.

[6]The State conceded at oral argument that Mrs. Dane was seized when she was led through two locked doors to the private conference room. *State v. Lund*, 70 Wn. App. 437, 446, 853 P.2d 1379 (1993).

his property, (2) transfer of her husband to Spokane, and (3) no loss of good time for her husband. Reno said that he could help with the first two demands, but he could not do anything about Mr. Dane's good time. The investigators and Mrs. Dane then discussed the dangers of Mrs. Dane carrying foreign substances inside her body. Mrs. Dane asked if she could go to a local store and remove the items, but Investigator Reno said that would "break the chain of evidence." About 20 minutes after the interview began, Reno left the room to get Deputy Ron Cameron and Detective Shawn Madison.[7] When Reno left the room, Mrs. Dane complained of a burning sensation in her vagina. Hansson told Mrs. Dane that she was "just going to have to wait until Mr. Reno came back with the sheriff's department."

According to Deputy Cameron, Reno had previously arranged to have the officers present on October 11. Acting on Reno's information, the officers had been parked in front of a store a few miles from the prison. They saw Mrs. Dane arrive and use the store's restroom. Deputy Cameron followed her to the prison. The deputy posed as a visitor, entered the prison, and sat in the lobby. He saw Investigator Hansson follow Mrs. Dane into the restroom. Deputy Cameron saw the two exit the restroom, but he continued to wait in the lobby until contacted by Investigator Reno. After Reno told him that Mrs. Dane had admitted to carrying contraband, Deputy Cameron radioed Detective Madison and a Detective Sergeant Pierce, who were still at the store. He waited for them in a prison conference area.

Detective Madison entered the private room, introduced himself, and expressed his concern about the dangers of carrying drugs inside her body. Mrs. Dane then demanded immunity, but when Madison said he could not do that, she got up to leave. Madison then arrested her. Mrs. Dane told Madison that she was going to remove the drugs to avoid any harmful effects. Investigator Hansson escorted Mrs. Dane to the restroom where she removed 11 balloons from

---

[7]Deputy Cameron is an officer of the Clallam County Sheriff's Department. Detective Madison is an officer of the Sequim Police Department. Both officers are assigned to the Clallam County Drug Task Force.

her body. Ten balloons contained marijuana and one balloon contained heroin. Mrs. Dane later made a taped statement admitting to the crime.

Mrs. Dane moved to suppress all the evidence obtained after Investigator Hansson "seized" Mrs. Dane in the restroom stall. The court decided to rule on the issue after the verdict. The jury convicted Mrs. Dane and the court then denied the motion to suppress, concluding that Investigator Hansson had a reasonable and articulable suspicion that Mrs. Dane was carrying contraband because of (1) the anonymous note, (2) Mr. Dane's association with inmates known to have previous drug problems in the prison, and (3) Mrs. Dane's nervous demeanor.

Mrs. Dane contends that the correctional investigators had no authority to detain and question her, and that even if they had such authority, they exceeded the scope of a *Terry* stop.[8]

## ANALYSIS

 Investigator Hansson testified that she may not arrest or detain visitors. She is correct; prison investigators are peace officers only "while acting in the supervision and transportation of prisoners, and in the apprehension of prisoners who have escaped." RCW 9.94.050. Her testimony also conforms with the regulations governing the search of visitors at prisons,[9] the purpose of which is to "prevent possible delivery of weapons, controlled substances, or contraband to residents." WAC 275-80-905(1). According to the regulations, investigators may "frisk search" all visitors. WAC 275-80-905(1). And investigators may search a

---

[8]*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[9]The Department of Social and Health Services promulgated the regulations in 1973 under RCW 43.17.060. Regulatory authority over prisons was transferred to the newly created Department of Corrections in 1981. RCW 72.09.040. The Department of Corrections has never revised the WACs governing the searches of prison visitors.

"visitor's person" if they have a "real suspicion"[10] that smuggling is imminent. WAC 275-80-905(2). But before initiating any search procedure, investigators must ask for the visitor's consent so that the visitor may exercise the option of refusing. WAC 275-80-910(2), -915. If the visitor refuses, investigators may expel the visitor and revoke the visitor's visitation rights. WAC 275-80-915. But if investigators have a "real suspicion substantially ahead of the arrival time of the visitor," regulations require that the local police handle the search procedure. WAC 275-80-925(1).

Here, the investigators violated these search procedures. First, prison investigators had no authority to detain Mrs. Dane. *See* RCW 9.94.050. Second, the investigators never asked Mrs. Dane if they could search her. If they had, she could have invoked her option to refuse, and the consequence would have been expulsion, not prolonged questioning. Third, the investigators had at least a "few days" notice of Mrs. Dane's visit, yet they did not allow police officials to handle the search procedures. Deputy Cameron was present in the lobby when Investigator Hansson led Mrs. Dane into the private room. We agree with the State, and Mrs. Dane concedes, that the prison officials had a reasonable suspicion to detain and question Mrs. Dane pursuant to *Terry*. But the WACs contemplate that this be done by police officers, not prison officials, whose authority is limited to requesting a search and expelling if consent is not granted. We find a case from New Mexico instructive on this issue: *State v. Garcia*, 116 N.M. 87, 860 P.2d 217 (Ct. App. 1993).

In *Garcia*, prison officials conducted a strip search under a "Statement of Understanding," which visitors signed before entering the prison. *Garcia*, 860 P.2d at 220. The statement explained that upon entry to the prison grounds, all visitors would be questioned by the "Traffic Control Officer" and that vehicles could be searched. *Garcia*, 860 P.2d

---

[10]WAC 275-80-805(7): " 'Real suspicion' is a subjective suspicion supported by objective, articulable facts, which would reasonably lead an experienced prudent correctional institution staff member to believe that a crime is imminent, is occurring or has occurred."

at 220. The statement then noted that "[i]ndividuals who choose not to enter at this point will be escorted off institutional grounds." *Garcia*, 860 P.2d at 220. The Statement also informed visitors that "[w]here there exists a reasonable suspicion that a particular visitor is attempting to introduce contraband into the Institution, the Duty Officer at the facility may order at any time that the visitor be subjected to a more thorough search." *Garcia*, 860 P.2d at 220. In addition to the Statement, visitors signed a log informing them that "prior to entering the facility, upon reasonable cause, [visitors] may be subject to search." *Garcia*, 860 P.2d at 220. "[I]f you choose not to enter," it continued, "you will not be subject to a search and you will be escorted from the facility grounds." *Garcia*, 860 P.2d at 220.

Prison officials had suspected visitor Diane Garcia of smuggling drugs. When she arrived at the prison, guards escorted her past two security doors into a conference room. A guard explained his suspicion and asked if he could strip-search her. Garcia refused. But instead of escorting her off the premises, as required by prison regulations, the official told her that if she did not consent, the state police would be contacted and a search warrant requested. After "further detention," the case does not explain how long, Garcia agreed to a search and contraband was found. *Garcia*, 860 P.2d at 218. The New Mexico Court of Appeals ordered the evidence suppressed because "when Appellant refused to consent to the search, prison authorities should have escorted her off the premises." *Garcia*, 860 P.2d at 221. When they did not, the officials "had no authority to conduct a search." *Garcia*, 860 P.2d at 221.

██ ██ We find *Garcia* persuasive and hold that Mrs. Dane's confession and the subsequent seizure of contraband resulted from an unauthorized detention by the prison officials. The motion to suppress should have been granted. *Garcia*, 860 P.2d at 221; *see State v. Rife*, 133 Wn.2d 140, 150-51, 943 P.2d 266 (1997) (suppressing evidence following unauthorized warrant check); *cf State v. Sweeney*, 56 Wn.

App. 42, 48-50, 782 P.2d 562 (1989) (suppressing evidence following violations of Job Corps regulations).

The dissent disagrees, citing *People v. Turnbeaugh*, 116 Ill. App. 3d 199, 451 N.E.2d 1016, 71 Ill. Dec. 862 (1983). In that case, a prison visitor challenged the search of his car by prison guards. He contended the guards failed to comply with the prison's "internal regulations" that required, in the court's words, "the option of leaving the premises instead of being searched." *Turnbeaugh*, 451 N.E.2d at 1018, 1020. The Appellate Court of Illinois rejected the visitor's argument because he did "not offer authority upon which [the court] might accord the violation some significance in the context of the case at bar." *Turnbeaugh*, 451 N.E.2d at 1020. We agree. A prison's internal policy is not necessarily the "equivalent of an administrative rule." *Melville v. State,* 115 Wn.2d 34, 40, 793 P.2d 952 (1990). Because the visitor provided no authority that a prison's internal policies created a governmental duty, the *Turnbeaugh* court properly rejected the argument. *Melville,* 115 Wn.2d at 40 ("Plaintiff has not established that a [Department of Corrections'] policy directive is the equivalent of an administrative rule which may create liability under appropriate circumstances."); *see State v. Rainford*, 86 Wn. App. 431, 439-40, 936 P.2d 1210 (1997) (noting that "technical violations" of prison's internal policies did not violate due process).[11]

We reverse and remand for further proceedings consistent with this opinion. We assume that our holding will preclude further prosecution of the case. Because of this, we do not address the issues raised by the State on cross-appeal. In the event the State is able to re-try Mrs. Dane,

---

[11]The dissent also relies on *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973); *State v. Custodio*, 62 Haw. 1, 607 P.2d 1048 (1980); and *State v. Manghan*, 126 N.J. Super. 162, 313 A.2d 225 (1973). But these cases do not address the issue of prison guards conducting detentions and searches outside the scope of their regulations. *Cf.* 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 10.7(b), at 660 (3d ed. 1996) (criticizing *Manghan* because "need to prevent the introduction of contraband . . . into the jail . . . is accomplished if the person declines to be searched and departs").

consistent with this opinion, it may move for reconsideration of the issues raised in its cross-appeal.

Reversed and remanded.

HOUGHTON, C.J., concurs.

HUNT, J. — (dissenting). I respectfully dissent. Because prison visitors voluntarily subject themselves to possible searches as a condition of entry into a secured correctional facility, they have diminished expectations of privacy. I disagree that the exclusionary rule applies to prison guards' failure to follow WAC procedures for searching prison visitors, especially for conjugal or other contact visits. Even if the exclusionary rule were applicable in such cases, it does not justify suppressing evidence here because no WAC procedures were violated.

Here the guards violated no WACs. The majority and Mrs. Dane agree that "the prison officials had a reasonable suspicion to detain and question Mrs. Dane pursuant to *Terry*." *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Majority op. at 232. But the majority asserts that "the WACs contemplate that this be done by police officers, not prison officials" and that the guards' failure to call in the police sooner invalidates their detention and questioning of Mrs. Dane. Majority op. at 232. There are no WACs governing detention of prison visitors by prison guards.[12] WAC 275-80-925(1), upon which the majority apparently relies, provides merely that the prison superintendent *"should,"* not *must*, contact local law enforcement to handle *search* procedures when there is "real suspicion substantially ahead of the [visitor's] arrival time" that the "visitor is attempting to smuggle in . . . illegal or contraband items." There is no requirement that prison officials call in police to assist with the detention and questioning undertaken here.

---

[12]WAC 275-80-905(1) governs detentions implicit in frisk searches:

To prevent possible delivery of weapons, controlled substances, or contraband to residents, all visitors are subject to a frisk search and inspection of any purses, packages, briefcases, or similar containers which are brought behind the security walls of the institution or into the visiting area.

The majority also asserts that the WACs governing full searches of visitors were violated because the prison guards did *not* attempt to search Mrs. Dane and consequently did not trigger her option to refuse and depart under WAC 275-80-915. Had the guards undertaken such a search, then arguably they might have violated WAC 275-80-925(1). But the guards refrained from searching Mrs. Dane themselves; instead they called in the police to conduct the search, in accordance with WAC 275-80-925(1). I fail to see how the guards' actions in this case constitute a Fourth Amendment violation.

## I

### NOTICE OF PRISON VISITOR SEARCH

Mrs. Dane passed signs posted both outside and inside the Clallam Bay Corrections Center, warning of the possibility of search and prosecution for possessing controlled substances on prison premises. Majority op. at 228-29 n.3. She also signed a consent to search as a condition precedent to visiting her inmate husband.[13] She was not a random visitor, untainted by suspicion of security-threatening activity. Thus it is irrelevant that the consent form mentioned the option of departure in lieu of a search, where, as here, 1) suspicion had focused on Mrs. Dane as a possible drug smuggler, and 2) there was no triggering of the departure option because the guards never attempted a search and Mrs. Dane, thus never refused. Moreover, Mrs. Dane did not ask to leave until after acknowledging the drugs were secreted in her vagina and became concerned about leakage endangering her health.

---

[13]*See State v. Custodio*, 62 Haw. 1, 607 P.2d 1048 (1980), where the defendant consented to a search resulting in the discovery of contraband. The Illinois court in *People v. Turnbeaugh*, 116 Ill. App. 3d 199, 451 N.E.2d 1016 (1983), adopted the Hawaiian court's observation that the "[s]earch of her person and production of the balloon was only a condition of entry to the prison. To avoid the search appellee need only have refrained from seeking admission." *Custodio*, 607 P.2d at 1051-52.

## II

### No Justified Expectation of Privacy

" ' "[T]he Fourth Amendment protects people, not places." ' "[14] The Fourth Amendment does not protect a person's every expectation of privacy,[15] but rather only those " 'that society is prepared to recognize as "reasonable." ' "[16]

> [I]n order for an expectation to be considered justified it is not sufficient that it be merely reasonable; it must be based on something in addition to a high probability of freedom from intrusion . . . . Justification . . . [is] intended to be a basis of differentiating those expectations which are merely reasonable from those expectations which are to be constitutionally enforced due to other social considerations.[17]

Whether reliance upon privacy is "justified" is dependent on " 'the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement.' "[18] In *State v. Manghan*, 126 N.J. Super. 162, 313 A.2d 225 (1973), the New Jersey Superior Court performed this balancing test, allowed detention of a prison visitor in spite of a request to depart, and upheld denial of a motion to suppress contraband drugs. The court ruled:

[14]1 Wayne R. LaFave, Search and Seizure § 2.1, at 227 (1978) (quoting Justice Harlan in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).

[15]In the recent case of *In re the Personal Restraint Petition of Maxfield*, 133 Wn.2d 332, 945 P.2d 196 (1997), the Supreme Court noted, " '[t]he assessment of whether a cognizable privacy interest exists under [article I, section 7] is thus not merely an inquiry into a person's subjective expectation of privacy but is rather an examination of whether the expectation is one which a citizen of this state should be entitled to hold.' " *Maxfield*, 945 P.2d at 200 (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 270, 868 P.2d 134 (1994)). The court in *Maxfield* found an expectation of privacy in public utility records. Application of the *Maxfield* privacy interest test to this case should yield this result: A citizen under suspicion for drug smuggling should not be entitled to an expectation of body cavity privacy when entering state prisons to visit an inmate.

[16]LaFave, *supra* § 2.1, at 230 (again quoting Justice Harlan).

[17]LaFave, *supra* § 2.1, at 231 (quoting Note, 43 N.Y.U. L. Rev. 968, 983 (1968)).

[18]LaFave, *supra* § 2.1, at 231 (quoting Justice Harlan's dissent in *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122, 26 L. Ed. 2d 453 (1971)).

The circumstances surrounding this incident certainly should be classified as exceptional or exigent. . . . *[Davis v. Reynolds]*, 319 F. Supp. 20, [22] (N.D. Fla. 1970), states:

> [T]here are instances when the procedural safeguards and requirements of the Fourth Amendment are less stringent than might ordinarily be expected.
>
> [W]here a search is made to maintain order or discipline, to maintain security or to prevent the entry of forbidden articles into a designated area then a warrantless search is proper.

It is vital that contraband articles be kept out of a prison. This is necessary for the protection of the inmates, employees of the institution and law enforcement officials assigned to that institution. There is also a duty toward society which dictates that articles must be kept from a penal institution that would facilitate escape from such institutions.

> The State not only has the right, but an obligation, to adopt laws which promote and insure the safety, health and morals of the inmates. . . . [T]he perils of the availability of drugs in a penal institution cannot be exaggerated. The ultimate purpose of a penal institution is rehabilitation. Such an institution has a duty to adopt reasonable procedures to insure that drugs are not available to inmates.

*Manghan*, 313 A.2d at 227.

Similar to New Jersey, the Washington Legislature has deemed this issue so important that it enacted RCW 9.94.045 (prohibits drugs) and RCW 9.94.043 (prohibits deadly weapons), imposing penalties upon persons attempting to take contraband into penal institutions. To enforce these statutes and to protect the security of the prison, it was not unreasonable for prison personnel to detain Mrs. Dane to check out their suspicions. The fact that signs were posted informing visitors that they were subject to such a search was determinative in *Manghan*; it should also be determinative here. Accordingly, Mrs. Dane had a reasonable expectation that as a prison visitor she was subject to search. Again, for exclusionary rule purposes, it should be irrelevant that a prison guard initially detained and questioned her rather than a police officer.

The New Jersey court analogized prison visitor searches to federally authorized customs, border, and anti-hijacking airport searches:

> [T]hese are situations where it is extremely necessary to detect and confiscate contraband. There are exceptional instances where warrantless searches are authorized. *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973); *United States v. Thompson*, 475 F.2d 1359 (5th Cir. 1973); *United States v. Espinoza*, 338 F. Supp. 1304 (S.D.Cal. 1972). These cases also hold that such warrantless searches may be conducted on "mere suspicion" of criminal activity in the absence of probable cause or when it is negligible.

*Manghan*, 313 A.2d at 228. The *Manghan* court applied the exigent circumstances of airport searches to searches of prison visitors:

> There is a definite and substantial interest in keeping contraband from a penal institution. In addition, the person to be searched must voluntarily come to and enter the search area, as defendant did. He had every opportunity to avoid the procedure by not entering the visitors area. A sign was posted informing him of his liability to such a search.
>
> The court feels that less stringent constitutional standards may be applied in this type of situation since the intrusion is so necessary and the circumstances under which such a search is conducted make it much less likely that abuses will occur:
>
>> The public is assured that the net can sweep no wider than necessary since the broad right to search is limited to the last possible point in time and space which could protect the aircraft, the boarding gate (or secure corridor entrance). Thus, no mere passerby will be subject to this search — only those in the act of boarding planes could be involved. ([*Skipwith*], 482 F.2d at 1276).
>
> Once again, this logic can be applied to the issue before the court. In order to be subject to such a search one must pass through the gates of a penal institution and enter a specific area. A person walking past an institution, even if he appears suspicious, would not automatically be subject to such a search.

The State has alleged that defendant gave his "implied

consent" to this search in view of the fact that he passed the sign at least 12 times and entered the visiting area. While there is some merit in this argument in looking at the totality of the circumstances, this court will not impose this standard for consent upon defendant. In authorizing this warrantless search the court is not basing its conclusions on whether defendant waived his right to Fourth Amendment protection but upon the necessity and reasonableness of such a search.

*Manghan*, 313 A.2d at 228. Similarly, the case before us demonstrates the necessity and reasonableness of detaining Mrs. Dane to confirm the prison guards' suspicion of drug smuggling.

## III

### Suspicion of Smuggling Vitiates Departure Option
#### A. Prison Security

Because the Fourth Amendment protects "persons," it is irrelevant whether Mrs. Dane's detention and questioning were performed by a prison guard or a police officer. The quality and degree of intrusion are the same. The majority relies on the New Mexico *Garcia*[19] case for the proposition that prison visitors must be given the option of departing rather than being subject to search.[20] But *Garcia* involved a

---

[19]*State v. Garcia*, 116 N.M. 87, 860 P.2d 217 (Ct. App. 1993).

[20]In *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) the Ninth Circuit ruled airport screening searches reasonable only if individuals are given the option of avoiding the search by electing not to board the aircraft. Here, Mrs. Dane had the option of avoiding a similar screening search by electing not to seek entry to the prison as an inmate visitor. Once she elected to enter, crossed the prison threshold, and signed the consent form, however, she voluntarily subjected herself to the possibility of search. She did not seek to depart until it became clear that her drug smuggling attempt had been detected and the guards had probable cause to believe that she was committing a crime.

Although *Davis* did not involve a search of someone upon whom suspicion had focused, the court nevertheless acknowledged that independently justified searches, other than consensual screening searches of every passenger, serve

the purpose of apprehending violators of either the criminal prohibition against attempting to board an aircraft while carrying a concealed weapon . . . or some other criminal statute. Such searches would be criminal investigations subject to the warrant and probable cause requirements of the Fourth Amendment.

nonconsensual strip search. Here, as the majority acknowledges, there was no search.

In contrast with *Garcia*, the New Jersey court was not swayed by the argument that a prison visitor suspected of drug smuggling should be given the option of departing:

> This court finds no merit in defendant's argument that once the nature of the search became apparent, he should have been permitted to leave the visitors area since he did not desire to be subjected to such a search. Once again, the standards set for airport searches are applicable:
>
>> Such an option would constitute a *one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful.* Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would by diminishing the risk, encourage attempts. Established search procedures are perhaps more valuable by what they discourage, than by what they discover. I see *no constitutional requirement, where a defendant knew by objective signs that he was incurring the possibility of a search, that he should thereafter be allowed to play heads–I–win, tails–you–lose.* [United States v. Skipwith, 482 F.2d at 1281]
>
> When a sheriff's officer had a tip from an extremely credible informant, that heroin had previously been brought into the jail by this defendant, he could not be allowed the option to leave without being searched. This would render such safeguards totally ineffective.

*Manghan*, 313 A.2d at 228-29 (emphasis added).

Similarly, Mrs. Dane had no justified expectation of freedom from detention, questioning, and search; rather, she was expressly on notice that by entering the prison as a visitor, she voluntarily subjected herself to such intrusions. Mrs. Dane followed neither the law nor prison visita-

---

*Davis*, 482 F.2d at 911-12 (citation omitted). Thus although an airplane passenger or a prison visitor may avoid a general screening search by choosing not to board the aircraft or visit a prisoner, neither can avoid a search where, as here, there is probable cause to believe that the person is committing a crime, especially of the type that the screening procedure was designed to reveal.

tion regulations.[21] She intentionally tried to smuggle heroin and marijuana in to her husband in prison. Because suspicion had focused on her as a likely drug smuggler, the prison guards should not have been required to let her leave, only to return to try again, next time perhaps successfully.

The Illinois court ruled similarly in *People v. Turnbeaugh*, 116 Ill. App. 3d 199, 451 N.E.2d 1016, 71 Ill. Dec. 862 (1983). Turnbeaugh's car was searched as he entered prison grounds; illegal drugs were seized. Like Mrs. Dane, he argued that he should have been given the opportunity to depart. The Illinois court disagreed, citing the "one-way street for mischief" language of *Manghan*, 313 A.2d at 228. *Turnbeaugh*, 451 N.E.2d at 1019.

### B. Failure to Follow Administrative Procedures

Contrary to the majority's assertion, the guards conducting the search in *Turnbeaugh* failed to comply with the Department of Corrections' directive that an individual whose person or vehicle is subject to search be offered the option of leaving the premises instead of being searched.[22] In contrast with the New Mexico court in *Garcia*, the Illinois court declined to accord exclusionary-rule significance to violation of the directive.[23] *Turnbeaugh*, 451 N.E.2d at 1020.

---

[21]WAC 275-80-900(1) provides: "A visitor may not bring contraband into an institution . . . ."

[22]The majority apparently distinguishes the violation of a prison "directive" or "internal policy" in *Turnbeaugh* from violation of a prison "administrative rule." The cases cited by the majority imply that such distinction may be relevant only where violation of prison policy also violates due process. Here there is no showing of due process or WAC violation. If the detention and questioning of Mrs. Dane had been performed by the police, there would be no question about the reasonableness and legality of their actions. Rather it is only because she was detained by prison guards, rather than police (not violative of any constitutional right of Mrs. Dane), that the majority overrules the trial court, suppresses the evidence, and reverses Mrs. Dane's conviction.

[23]The Illinois court expressly declined to follow a Colorado case similar to *Garcia, People v. Thompson*, 185 Colo. 208, 523 P.2d 128 (1974), where the defendant was searched, apparently without consent, resulting in the discovery of two bottles of whiskey. Noting, inability "to detect anything approaching a semblance of probable cause to search," (*Thompson*, 523 P.2d at 130), the Colorado Supreme

Again, here there was the additional element of focused suspicion on Mrs. Dane, smuggling drugs to her inmate-husband. As conceded by Mrs. Dane and the majority, detention to check out that suspicion was justified under *Terry*. The detention violated no WAC provision; at most, according to one of the prison investigators, it may have violated some internal prison policy concerning detention of visitors.

In the course of that detention, Mrs. Dane admitted that she was in possession of drugs. The guards did not seize the drugs from her, though they prevented her use of the bathroom until police arrived to monitor her use of the bathroom to extract the leaking drugs from her vagina.

It is immaterial for exclusionary rule purposes that the guards' conduct in detaining Mrs. Dane may have been contrary to prison policy[24] or to Mrs. Dane's hope that she might leave if confronted with a demand to search. There are no Washington cases on point. But our recent case of *State v. Rainford*, 86 Wn. App. 431, 936 P.2d 1210 (1997), is instructive. In that case we held that "Rainford's constitutional rights were not violated even though Clallam Bay Correction Center did not follow exactly their procedure for a dry cell search," based on a *reasonable articulable suspicion* of criminal activity. *Rainford*, 86 Wn. App. at 434.

Mrs. Dane's expectation of privacy or right to depart might have been justified if she had been randomly selected for a routine search. But Mrs. Dane was not selected randomly and she was not searched. Rather, the prison guards reasonably suspected that she might be smuggling drugs into the prison; they detained her to confirm their

---

Court held that the evidence should have been suppressed. In contrast, here, although there was no search there was probable cause to arrest, at least by the time Mrs. Dane disgorged the drugs.

[24]Mrs. Dane's detention did not violate any administrative regulation as provided in the WAC. Even if it did, violation of administrative regulations does not automatically warrant suppression of seized evidence, unless such violation "also constitutes a statutory or constitutional violation." *State v. Sweeney*, 56 Wn. App. 42, 50, 782 P.2d 562 (1989) (school search contrary to school regulations).

suspicions.[25] An overriding public interest in the security of prisons weighs heavily on the balance against Mrs. Dane's diminished expectation of privacy. *See Turnbeaugh*, 451 N.E.2d 1016.

## CONCLUSION

The prison guards violated no administrative procedures regulating searches of prison visitors. Because they did not intend to search Mrs. Dane, they did not ask for her consent. Contrary to the majority's assertion, failure to attempt a search, which might have triggered Mrs. Dane's request for departure, is a violation of neither prison regulations nor the Constitution.

LaFave notes that prison visitors surrender Fourth Amendment rights as a condition of the "privilege of entry." 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 10.7(b) (3d ed 1996). Prison visitors who self-select are subject to a search by virtue of their decision to visit the detention facility. Mrs. Dane subjected herself to the possibility of a search, in spite of advance notice; moreover, she had apparently visited her husband before and was aware of prison policy. The fact that the consent form mentioned the option of departing rather than being searched, did not nullify Mrs. Dane's subsequent detention once she entered the prison.[26]

I would hold that a person smuggling drugs inside his or

---

[25]The court in *Maxfield* noted that "in addition to a lack of statutory authority, there was nothing to indicate a reasonable suspicion of criminal activity at the time the [electricity usage] records were disclosed." *Maxfield*, 945 P.2d at 201. The *Maxfield* court goes on to explain how, lacking such suspicion, the fact of high electrical usage was consistent in that case with the reported usage of pottery kilns at the location in question.

[26]The Supreme Court's recent jaywalker-stop case, *State v. Rife*, 133 Wn.2d 140, 943 P.2d 266 (1997), is distinguishable. In *Rife* the court suppressed evidence seized pursuant to arrest on a warrant discovered upon a warrant check during a stop for jaywalking. The municipal code did not authorize a warrant check during the reasonably brief detention allowed for a traffic infraction stop, and there was no "reasonable suspicion" that the pedestrian had "committed any other offense." But here, although the guards may not have followed prison procedures in detaining Mrs. Dane while they summoned police to conduct a search, they did have a reasonable suspicion that Mrs. Dane was committing a drug-smuggling offense inside the prison. Moreover, as previously noted, there is a divergence in

her body, who voluntarily enters a prison for a conjugal visit with a prisoner, despite signs warning of being subject to search, does not reasonably have the same expectation of privacy enjoyed by citizens in their homes or innocently walking down the street. Mrs. Dane subjected herself to the possibility of search simply by entering the prison for the purpose of visiting her inmate-husband. She cannot now complain that alert prison guards thwarted her drug-smuggling.

I would not extend the exclusionary rule to the guards' failure to follow administrative procedures under these circumstances, especially where their actions, had they been performed by the police, would have been considered valid. I would affirm the trial court's denial of Mrs. Dane's motion to suppress and affirm her conviction.

Reconsideration denied February 3, 1998.

Review denied at 135 Wn.2d 1014 (1998).

the reasonable expectations of freedom from government intrusion in crossing a street and in entering a prison to visit an inmate.