## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 6, 2018

**NO. A-1-CA-34545**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**EUGENE CHACON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sheri A. Raphaelson, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John J. Woykovsky, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
C. David Henderson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VIGIL, Judge.**

{1}     This case involves the constitutionality of a second strip search of Defendant Eugene Chacon in which correctional officials at the Santa Fe County Adult Detention Facility (SFCADF) discovered heroin on Defendant's person. We are required, as a matter of first impression, to determine the appropriate standard required to perform a second strip search of an inmate who has had no contact with anyone outside of the jail. We hold that such a search requires reasonable suspicion and that the strip search of Defendant was supported by reasonable suspicion. We therefore affirm.

**I.     BACKGROUND**

{2}     On the evening of June 5, 2013, Defendant was booked into SFCADF on charges that included trafficking a controlled substance. It is the facility's policy to perform a "visual examination of an individual's naked body for weapons, drugs or other contraband[,]" which we herein refer to as a "strip search," on all individuals arrested for certain charges, including drug trafficking charges. Pursuant to the policy, Defendant was strip searched during the booking process. Two officers took Defendant into the restroom where Defendant was required to remove his clothing one item at a time, lean over, and cough. During this search, the officers found a blue

rubber glove, but the record does not indicate where the officers found the glove. Defendant was then taken to a booking intake cell, where he was kept until the next day.

{3}     The following morning, June 6, 2013, Defendant was sent to an "orientation pod" called the Alpha 300 Pod, where he was to be kept until classified to an appropriate housing unit according to his status (i.e., threat level). The Alpha 300 Pod is a two-tiered unit with a large common room on the bottom floor. One wall of the pod has two floors of cells, with six cells on each floor. The odd numbered cells (301 through 311) are situated on the bottom floor, while the even numbered cells (302 through 312) are on the top floor. The cells all have doors with a narrow window running vertically in the middle of the door.

{4}     On the morning of June 7, 2013, Lieutenant Charlie Valdez, a shift commander at SFCADF, received an anonymous tip that several inmates in the Alpha 300 Pod had drug paraphernalia. Between 7:12 a.m. and 8:48 a.m., several inmates in the Alpha 300 Pod were moving from their cells to the common area and to other inmates' cells, including 301, 303, 305, 307, and 311, where they would remain for a brief period of time. They would then briefly return to their own cells before repeating this process. On several occasions, an inmate from cell 301—the cell in which Defendant and another inmate were held—appeared to go inside cells 303 and

307, stay inside for a while, return to his room, and go back into one of those rooms. Officer Joseph Cross, the floor officer, noticed this activity and deemed it unusual and suspicious.

{5} The inmates' behavior combined with the anonymous tip prompted the correctional officers to enter the pod and direct the inmates to line up against a wall in the common area. Officer Cross entered cell 303 and discovered its two occupants, neither of whom were Defendant, to be in possession of drugs. Major Nelson Abeyta, the chief of security, noticed Officer Cross escorting inmates and entered the Alpha 300 Pod to assist him. Officer Cross informed Major Abeyta of what had just happened, and identified to Major Abeyta the inmates who were engaging in the unusual and suspicious behavior were in the area of cell 303 and should therefore be strip searched.

{6} Defendant was one of the inmates Officer Cross identified. Major Abeyta took Defendant into a mop closet for privacy and directed him to remove his clothes, lift his arms and tongue, lean over, hold his testicles, squat, spread his buttocks, and cough. When Defendant squatted and coughed, Major Abeyta spotted a string from Defendant's anal cavity. Major Abeyta told Defendant to either "give up" what he had or be sent to a dry cell (i.e., a cell with either no plumbing fixtures or plumbing fixtures that can be turned off. Defendant was compliant and pulled a "black tar[-]like

3

rock" wrapped in plastic from his anal cavity and gave it to Major Abeyta. Testing confirmed that the plastic contained heroin.

{7} Charged with possession of a controlled substance (heroin), Defendant filed a motion to suppress the heroin seized from his body, asserting that the search violated the Fourth Amendment of the United States Constitution and Article II, Section 4 of the New Mexico Constitution. Following an evidentiary hearing in which the foregoing facts were presented, the district court denied Defendant's motion. The district court ruled that reasonable suspicion was the standard under which the constitutionality of the search was to be measured and concluded that the evidence demonstrated that the search was supported by reasonable suspicion. Following a jury trial, Defendant was found guilty and appeals.

## II.    DISCUSSION

{8} Defendant does not contend that the first strip search was unconstitutional. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322-23 (2012) (upholding the constitutionality of a jail's policy requiring a strip search of every arrestee upon his/her admission to the jail).

{9} Defendant does, however, argue that the second strip search of his person was unconstitutional under the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. This argument requires us to

4

first determine the standard for deciding the constitutional reasonableness of the strip search of a pretrial detainee who was strip searched upon booking, has remained in the sealed correctional facility environment without any contact external to the correctional facility, and is then subjected to a second strip search. This is a question of first impression in New Mexico.

**A.    The Constitutional Standard**

{10}    The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. One of the most weighty considerations in determining constitutional reasonableness in the correctional facility context is internal security. *See Hudson v. Palmer*, 468 U.S. 517, 524 (1984) (concluding that, while correctional facilities are not beyond the reach of the Constitution, "imprisonment carries with it the circumscription or loss of many significant rights" made "necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security" (internal quotation marks and citations omitted)). However, incarcerated individuals do not forfeit all constitutional protections by reason of their confinement. *Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). Courts therefore recognize that prisoners have a limited Fourth Amendment right to bodily privacy.

5

*See Bell v. Wolfish*, 441 U.S. 520, 558 (1979) (addressing visual body cavity searches of inmates and assuming "inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility"); *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) ("[W]e have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context.").

{11}     Thus, while courts are necessarily deferential to correctional facility administrators in policies and practices they adopt that, in their judgment, are necessary "to preserve internal order and discipline and to maintain institutional security[,]" *Bell*, 441 U.S. at 547, courts remain responsible for protecting the constitutional rights of prisoners. *See Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974) (stating that federal courts will discharge their duty to protect constitutional rights when prison regulations or practices offend fundamental constitutional guarantees), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).

{12}     We therefore require, consistent with the Fourth Amendment, that searches and seizures of prisoners be reasonable under all the facts and circumstances in which they are performed. In making this determination, we engage in a "balance between

the public and private interests at stake." *State v. Williams*, 2011-NMSC-026, ¶ 20, 149 N.M. 729, 255 P.3d 307.

{13} The public interests at stake are the necessity for maintaining the institutional security and preserving internal order and discipline of the correctional facility. *Bell*, 441 U.S. at 547. This necessarily includes detecting and deterring the possession of contraband such as drugs and weapons within the correctional facility. *Florence*, 566 U.S. at 328. That public interest justifies policies providing for strip searches at points of entry into detention facilities without any quantum of suspicion. *See id*. at 330 (holding that strip searches can be conducted on all new inmates upon admission to the detention facility); *Bell*, 441 U.S. at 558, 560 (holding that strip searches can be conducted on an inmate after every contact visit with someone from outside the facility); *Powell v. Barrett*, 541 F.3d 1298, 1300, 1314 (11th Cir. 2008) (interpreting the Supreme Court's decision in *Bell* to permit a strip search without reasonable suspicion when conducted during "the point-of-entry booking process before [the inmates] were placed into the general jail population"). The policies allowing the strip searches in these points-of-entry cases are justified on the basis that they are needed to prevent contraband from *entering* the correctional facilities. *See Florence*, 566 U.S. at 333-35 (explaining the purpose of the facility's policy was to prevent persons from introducing prohibited items into the facility); *Bell*, 441 U.S. at 559 (recognizing the

7

facility's need to deter inmates from smuggling money, drugs, weapons, and other contraband into the facility by concealing them in the inmates' body cavities).

{14}     While the need for a detention facility to deter and detect the introduction of contraband is at its peak at points of entry, that institutional need diminishes when a strip search takes place outside a point of entry. *See Arruda v. Fair*, 710 F.2d 886, 890 (1st Cir. 1983) (Maletz, J., concurring in part and dissenting in part). Searches within the correctional facility to discover the circulation of contraband, while certainly important, are not accompanied by the same circumstances that facilitate the smuggling of contraband into a facility. A correctional facility's institutional justification to conduct a second strip search is further reduced when it takes place shortly after a prior strip search and no contraband was discovered. *See, e.g.*, *N.G. v. Connecticut*, 382 F.3d 225, 234 (2nd Cir. 2004) (holding that a second strip search of a juvenile inmate to search for a missing pencil was unreasonable because the inmate had already been strip searched upon her initial admission to the facility); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (per curiam) (holding that a strip search of an inmate under continuous escort—conducted shortly after a prior strip search—was unnecessary and unconstitutional because there was no possibility that the inmate could have obtained and concealed contraband in the interim); *Green v. Martin*, 224 F. Supp. 3d 154, 164 (D. Conn. 2016) ("[W]hen two strip searches are

8

conducted close in time and the inmate had no opportunity to obtain contraband after the first search, then the second strip search may be unreasonable and unconstitutional because the inmate lacked an opportunity to obtain contraband in the time in between the searches."); *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 321, 323 (S.D.N.Y. 2006) (holding that a second strip search of an inmate—conducted after the inmate was previously strip searched, handcuffed, and escorted to another location—was unreasonable).

{15} The foregoing public interests must be balanced against the private interests at stake. As we have already noted, inmates have a Fourth Amendment right to the privacy of their bodies. Undoubtedly, and without question, strip searches invade and violate that privacy interest. Our own Supreme Court has declared that no matter how professionally and courteously a strip search is conducted, it is embarrassing, humiliating, and offensive to personal dignity. *State v. Garcia*, 1993-NMCA-105, ¶ 5, 116 N.M. 87, 860 P.2d 217. Regardless of whether a strip search is conducted at a point of entry or inside the secured area of a detention facility, they both invade an inmate's personal bodily privacy to an equal extent.

{16} In balancing the competing interests at stake, we agree with the district court that the appropriate standard for determining the constitutional reasonableness of the second strip search of Defendant is reasonable suspicion. At one extreme, courts may

9

require probable cause as the appropriate standard. *See Commonwealth v. Thomas*, 708 N.E.2d 669, 673 (Mass. 1999) ("[W]e conclude that probable cause is the appropriate standard to apply to strip and visual body cavity searches."). However, our view is that, given the exigencies inherent in a detention facility's environment, such a threshold tilts the balance too far in favor of the privacy interest and is therefore "an unrealistically high standard of proof" for correctional officials to satisfy. *Arruda*, 710 F.2d at 890 (Maletz, J., concurring in part and dissenting in part). At the other extreme, requiring no quantum of suspicion gives correctional officials unlimited, unreviewable discretion to conduct inherently degrading body cavity searches of all inmates. This standard fails to take into account the privacy interests at stake. We agree that the middle ground, reasonable suspicion "is flexible enough to afford the full measure of [F]ourth [A]mendment protection without posing an insuperable barrier to the exercise of all search and seizure powers." *Williams*, 2011-NMSC-026, ¶ 13 (internal quotation marks and citation omitted). Such a standard reasonably accommodates correctional officials' security concerns as well as the privacy right of an inmate who has had no contact outside the jail and has already been subjected to a strip search.

{17}     In balancing the public interests and private interests at stake, we hold that the second strip search of Defendant must be supported by a reasonable suspicion that

Defendant had contraband on or in his body cavity. Defendant was subject to a full strip search upon being booked into the SFCADF, and no drugs or other contraband was found. Defendant was then placed in a booking cell where he remained until he was placed in an orientation pod with other inmates awaiting their housing classification. The institutional need to conduct a strip search was diminished at this point. Less than forty-eight hours later, and without having had any contact with anyone outside the orientation pod, Defendant was subjected to a second strip search. Requiring the SFCADF officers to have a reasonable suspicion that Defendant had contraband on or in his body cavity strikes a proper balance between Defendant's Fourth Amendment right to his body privacy, and the need of the SFCADF officers to maintain institutional security and preserve the internal order and discipline of the facility. We now turn to whether the second strip search of Defendant was supported by reasonable suspicion.

**B.      Reasonable Suspicion Analysis**

{18}      Reasonable suspicion exists "when the officer becomes aware of specific articulable facts that, judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring." *State v. Martinez*, 2018-NMSC-007, ¶ 10, 410 P.3d 186 (internal quotation marks and citation omitted). "Unsupported intuition and inarticulate hunches are not sufficient." *State v. Garcia*, 2009-NMSC-

11

046, ¶ 43, 147 N.M. 134, 217 P.3d 1032 (internal quotation marks and citation omitted). In determining whether there is reasonable suspicion for a search, we assess the totality of the circumstances instead of looking at each individual factor in a vacuum on its own. *State v. Neal*, 2007-NMSC-043, ¶ 28, 142 N.M. 176, 164 P.3d 57.

{19} Our review of the district court's ruling on the motion to suppress presents a mixed question of fact and law. *Martinez*, 2018-NMSC-007, ¶ 8. First, in our review of the facts, "we defer to the district court's findings of fact if substantial evidence exists to support those findings and view the facts in the manner most favorable to the prevailing party." *Id*. ¶ 12 (internal quotation marks and citation omitted). In this regard, when the evidence is conflicting, we indulge in all reasonable presumptions in favor of the district court's ruling, disregarding all evidence and inferences to the contrary, and when evidence is uncontradicted, we presume the district court believed the uncontradicted evidence, unless it indicates to the contrary on the record. *State v. Jason L.*, 2000-NMSC-018, ¶¶ 10-11, 129 N.M. 119, 2 P.3d 856. Secondly, we review the district court's application of the law to those facts de novo to determine whether the search or seizure was constitutionally reasonable. *Martinez*, 2018-NMSC-007, ¶ 8.

{20} We conclude that under our standard of review, the evidence supports the district court's conclusion that the second strip search of Defendant was supported by reasonable suspicion. Defendant was booked into SFCADF on charges of trafficking a controlled substance and strip searched. Defendant was then held in a booking intake cell until the next morning, when he was transferred to the orientation pod. That morning, the shift commander received an anonymous tip that inmates in the orientation pod where Defendant was housed had drugs. The floor officer in the orientation pod also observed the inmates engaging in what was described as unusual and suspicious behavior and congregating, and it was decided to search one of the cells in which inmates were seen entering and leaving. That search resulted in the discovery that its occupants were in possession of drugs, which corroborated the anonymous tip. These facts and inferences viewed in the light most favorable to the district court's ruling establish a constitutionally sufficient reasonable suspicion to support the second strip search of Defendant. *See Hudson*, 468 U.S. at 526 (holding that the Fourth Amendment does not apply to the search of a prisoner's cell); *Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir. 1996) ("Although an anonymous tip, standing alone, may typically fail to create reasonable suspicion, an anonymous tip that is corroborated in some measure by actual facts or by other sources may be enough.").

13

**{21}** Defendant's remaining arguments were either not preserved or were undeveloped, and we decline to address them.

**III.  CONCLUSION**

**{22}** The order of the district court denying Defendant's motion to suppress is affirmed.

_____

**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____

**M. MONICA ZAMORA, Judge**

_____

**J. MILES HANISEE, Judge**